**Dean VETTER, Plaintiff,**

v.

**FARMLAND INDUSTRIES, INC., Defendant.**

No. C 94–3008.

United States District Court, N.D. Iowa, Central Division.

May 1, 1995.

1288

Professor John S. Allen and Student Interns Justin A. Teitle and Tiffany M. Ferguson of the Clinical Law Program of the University of Iowa College of Law, Iowa City, IA, for plaintiff Dean G. Vetter.

Stanley E. Craven of Spencer Fane Britt & Browne, Kansas City, MO, for defendant Farmland Industries, Inc.

## MEMORANDUM OPINION AND ORDER REGARDING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

BENNETT, District Judge.

**1292**

## TABLE OF CONTENTS

I. INTRODUCTION AND PROCEDURAL BACKGROUND ...................1293

II. STANDARDS FOR SUMMARY JUDGMENT .............................1294

III. FINDINGS OF FACT .............................................1296
 A. Undisputed Facts ...............................................1296
 B. Disputed Facts ................................................1297

IV. LEGAL ANALYSIS ................................................1299
 A. Disparate Treatment ...........................................1299
 1. The analytical framework for a disparate treatment claim ...........1300
 2. The *prima facie* case ..........................................1301
 3. Vetter's *prima facie* case .......................................1302
 4. Pretext .......................................................1304
 B. Failure To Accommodate ........................................1305
 1. The analytical framework for a failure to accommodate claim ........1305
 2. Vetter's *prima facie* showing ....................................1305
 a. Bona fide belief ............................................1306
 b. Notice to the employer and discharge ..........................1308
 3. Accommodation ...............................................1308
 a. The two-step analysis ......................................1308
 b. "Reasonable accommodation" and "undue hardship" ..............1309
 c. The employee's duty to cooperate ............................1310
 4. Accommodation in this case ...................................1311
 a. Ames as a reasonable accommodation ..........................1311
 b. Fort Dodge as a reasonable accommodation ....................1311

V. CONCLUSION ...................................................1312

 The parties have characterized this case as presenting the question of whether a former employee was simply too "choosy," or whether a former employer was simply too "unreasonable," about where the former employee had to live, and the further question of whether any of this had anything to do with the former employee's religion and the loss of his job.[1] Prior to plaintiff's discharge, the employer allegedly told plaintiff's wife that "sometimes you have to choose between your religion and your job," and the court also finds that it must explore the extent to which the contours of Title VII's prohibition on religious discrimination proscribes an employer from compelling an employee to make such a choice.

In this lawsuit, an adherent to the Jewish religion alleges that his discharge from his job with an agricultural products company for refusal to live within his sales territory was the result of religious discrimination in violation of federal and state antidiscrimination laws. The former employee also alleges that the employer failed to make reasonable accommodations to the former employee's religious beliefs. The agricultural products company has moved for summary judgment on the grounds that there is not a scintilla of evidence to support the former employee's claim of disparate treatment on the basis of religion, and, furthermore, that there is nothing in the Jewish faith that required the plaintiff to live outside of his sales territory such that the employer had any obligation to make accommodations to the plaintiff's religious belief.

---

1. The court believes that some people would find the employer's characterization of the plaintiff as being "too choosy" to be insensitive by fostering a negative stereotype of members of the Jewish faith. Thus, the court elects not to refer to the plaintiff's position as "too choosy," a characterization oft repeated in defendant's brief. However, Title VII does not prohibit insensitivity; rather, the proper inquiry under the statute is whether defendant has engaged in impermissible discrimination because of religion or has unreasonably failed to accommodate plaintiff's religious observances or practices.

## I. INTRODUCTION AND PROCEDURAL BACKGROUND

Plaintiff Dean G. Vetter, who is an adherent of the Jewish faith, filed the complaint in this matter on March 8, 1994, alleging religious discrimination in violation of Title VII, 42 U.S.C. § 2000e–2(a)(1) and Iowa Code § 216.6(1)(a). The defendant is Vetter's former employer, Farmland Industries, Inc. In August of 1992, Farmland hired Vetter as a Livestock Production Specialist (LPS) responsible for a trade territory surrounding Webster City, Iowa. Vetter began his employment with Farmland in September of 1992. Vetter alleges that his difficulties with his employer only began when his employer learned that he was Jewish, and that these difficulties ultimately resulted in his termination less than one month after he began working for Farmland.

Vetter pursued administrative remedies through both the Iowa Civil Rights Commission and the Equal Employment Opportunity Commission. Vetter received an administrative release, or right-to-sue letter, from the Iowa Civil Rights Commission on December 22, 1993. Similarly, Vetter received a right-to-sue letter from the EEOC on January 6, 1994. Vetter then filed this lawsuit on March 8, 1994.

Vetter's complaint is in four counts. Counts I and III allege disparate treatment on the basis of religion resulting in his discharge in violation of 42 U.S.C. § 2000e–2(a)(1) and Iowa Code § 216.6(1)(a), respectively. Vetter's disparate treatment claims are founded on allegations that after he informed his supervisor that he was Jewish and wished to live in Ames, Iowa, because it had an active Jewish Community, Farmland officials for the first time imposed a requirement that he live within the Webster City trade area, and ultimately terminated him for not accepting inadequate housing within that trade territory. Counts II and IV allege failure to make reasonable accommodations to Vetter's religious beliefs, also in violation of the same provisions of federal and state law, respectively. Vetter's claim of refusal to make reasonable accommodation is based on his assertion that he was willing to maintain a residence for himself in Webster City, while his family lived in Ames, but that Farmland rejected this suggestion and failed to offer any other reasonable accommodation. Vetter seeks damages, including lost past and future income and benefits, emotional distress, suffering, inconvenience, and humiliation, as well as costs and attorneys fees, and such other relief as the court deems just and proper.

Farmland answered the complaint on May 17, 1994, asserting as affirmative defenses, *inter alia*, that accommodation was not required on the facts stated and would have imposed an undue hardship, that Vetter failed to mitigate damages, and that Vetter was discharged for cause unrelated to his religion. Farmland asserted that all of its actions were taken in good faith for legitimate, nondiscriminatory business reasons.

Farmland moved for summary judgment on February 21, 1995. Farmland argues that Vetter does not have "a scintilla of evidence to support his claim of discriminatory conduct." Defendant's Brief In Support Of Motion For Summary Judgment, at 3. Farmland asserts that Vetter's own deposition testimony demonstrates that he did not encounter any hostility towards his religious beliefs from Farmland officials and that, had he been able to find "suitable housing" in Webster City, he would have been willing to relocate there. Farmland asserts that the real problem here is not discrimination, but Vetter's excessive choosiness about rental housing. Farmland also argues that there is nothing about the Jewish faith that required Vetter to live in Ames, only Vetter's personal preference. Farmland contends that it was willing to allow Vetter to live in Fort Dodge, which has a synagogue, but that Vetter rejected that accommodation, because he did not think the synagogue was active enough.

Vetter argues that the evidence demonstrates that Farmland's grounds for terminating him were a pretext for religious discrimination. Vetter asserts that Farmland has given a variety of reasons for his discharge, which is evidence that the reasons given are pretextual. Vetter also argues that more than one of Farmland's LPSs lives at a greater distance from cooperatives those LPSs serve than Vetter would have been

from the Webster City cooperative had he lived in Ames. He argues further that some LPSs have either been given permission to live outside of their trade areas or have been given several months to move into their trade areas, whereas he is the only LPS to be fired for not moving into his trade area, and then only one month after he was hired. Vetter also argues that he has established the elements of a *prima facie* claim of failure to accommodate his religion, because he has shown a genuine religious belief and negative employment decision following his notice to his employer of a conflict between that belief and job requirements. Finally, Vetter argues that Farmland cannot show undue hardship from accommodating his religious beliefs by allowing him to live in Ames.

The court held telephonic oral arguments on Farmland's motion for summary judgment on April 21, 1995. Vetter was represented at the oral arguments by Professor John S. Allen and student interns Justin A. Teitle and Tiffany M. Ferguson of the Clinical Law Program of the University of Iowa College of Law in Iowa City, Iowa. Farmland was represented at the oral arguments by Stanley E. Craven of Spencer Fane Britt & Browne in Kansas City, Mo.[2] This matter is now fully submitted, and the court therefore enters the following ruling on Farmland's motion for summary judgment.

## II. STANDARDS FOR SUMMARY JUDGMENT

■ The Eighth Circuit Court of Appeals recognizes "that summary judgment is a drastic remedy and must be exercised with extreme care to prevent taking genuine issues of fact away from juries." *Wabun–Inini v. Sessions*, 900 F.2d 1234, 1238 (8th Cir.1990). On the other hand, the Federal Rules of Civil Procedure have authorized for nearly 60 years "motions for summary judgment upon proper showings of the lack of a

genuine, triable issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986). Thus, "summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Wabun–Inini*, 900 F.2d at 1238 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986)); *Hartnagel v. Norman*, 953 F.2d 394, 396 (8th Cir.1992).

■ The standard for granting summary judgment is well established. *Rule 56* of the Federal Rules of Civil Procedure states in pertinent part:

Rule 56. Summary Judgment

(b) For Defending Party. A party against whom a claim ... is asserted ... may, at any time, move for summary judgment in the party's favor as to all or any part thereof.

(c) Motions and Proceedings Thereon.... *The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.*

*Fed.R.Civ.P.* 56(b) & (c) (emphasis added); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986); *Munz v. Michael*, 28 F.3d 795, 798 (8th Cir.1994); *Roth v. U.S.S. Great Lakes Fleet, Inc.*, 25 F.3d 707, 708 (8th Cir.1994); *Cole v. Bone*, 993 F.2d 1328, 1331 (8th Cir.1993); *Woodsmith Publishing Co. v. Meredith Corp.*, 904 F.2d 1244, 1247 (8th Cir.1990); *Wabun–Inini*, 900 F.2d at 1238 (citing *Fed.R.Civ.P.* 56(c)).[3] A court consid-

---

**2.** The student legal interns participated in this matter pursuant to the Rule 120 of the Court Rules of the Iowa Supreme Court governing practice by law students. The court was pleased with the quality of both the written and oral arguments of the student interns involved in this case.

**3.** An issue of material fact is genuine if it has a real basis in the record. *Hartnagel v. Norman*, 953 F.2d 394 (8th Cir.1992) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986)). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the

ering a motion for summary judgment must view all the facts in the light most favorable to the nonmoving party, here Vetter, and give Vetter the benefit of all reasonable inferences that can be drawn from the facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962)); *Munz v. Michael*, 28 F.3d 795, 796 (8th Cir.1994); *Allison v. Flexway Trucking, Inc.*, 28 F.3d 64, 66 (8th Cir.1994); *Johnson v. Group Health Plan, Inc.*, 994 F.2d 543, 545 (8th Cir.1993); *Burk v. Beene*, 948 F.2d 489, 492 (8th Cir.1991); *Coday v. City of Springfield*, 939 F.2d 666, 667 (8th Cir.1991), *cert. denied*, 502 U.S. 1094, 112 S.Ct. 1170, 117 L.Ed.2d 416 (1992).

▪ Procedurally, the moving party, here Farmland, bears "the initial responsibility of informing the district court of the basis for [its] motion and identifying those portions of the record which show lack of a genuine issue." *Hartnagel*, 953 F.2d at 395 (citing *Celotex*, 477 U.S. at 323, 106 S.Ct. at 2552–53); *see also Reed v. Woodruff County, Ark.*, 7 F.3d 808, 810 (8th Cir.1993). Farmland is not required by *Rule* 56 to support its motion with affidavits or other similar materials negating the opponent's claim. *Id.*

▪ "When a moving party has carried its burden under *Rule* 56(c), its opponent must do more than simply show there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586, 106 S.Ct. at 1356. Vetter is required under Rule 56(e) to go beyond the pleadings, and by affidavits, or by the "depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial." *Fed.R.Civ.P.* 56(e); *Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553. Although "direct proof is not required to create a jury question, ... to avoid summary judgment, 'the facts and circumstances relied upon must attain the dignity of substantial evidence and must not be such as merely to create a suspicion.'" *Metge v. Baehler*, 762 F.2d 621, 625 (8th Cir.1985) (quoting *Impro*

*Products, Inc. v. Herrick*, 715 F.2d 1267, 1272 (8th Cir.1983), *cert. denied*, 465 U.S. 1026, 104 S.Ct. 1282, 79 L.Ed.2d 686 (1984)), *cert. denied sub nom. Metge v. Bankers Trust Co.*, 474 U.S. 1057, 106 S.Ct. 798, 88 L.Ed.2d 774 (1986). The necessary proof that the nonmoving party must produce is not precisely measurable, but the evidence must be "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Allison v. Flexway Trucking, Inc.*, 28 F.3d 64, 66 (8th Cir.1994).

▪ In *Anderson*, 477 U.S. at 249, 106 S.Ct. at 2510–11, *Celotex*, 477 U.S. at 323–24, 106 S.Ct. at 2552–53, and *Matsushita*, 475 U.S. at 586–87, 106 S.Ct. at 1355–56, the Supreme Court established that a summary judgment motion should be interpreted by the trial court to accomplish its purpose of disposing of factually unsupported claims, and the trial judge's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial. *Johnson v. Enron Corp.*, 906 F.2d 1234, 1237 (8th Cir.1990). The trial court, therefore, must "assess the adequacy of the nonmovants' response and whether that showing, on admissible evidence, would be sufficient to carry the burden of proof at trial." *Hartnagel*, 953 F.2d at 396 (citing *Celotex*, 477 U.S. at 322, 106 S.Ct. at 2552). If Vetter fails to make a sufficient showing of an essential element of a claim with respect to which he has the burden of proof, then Farmland is "entitled to judgment as a matter of law." *Celotex*, 477 U.S. at 323, 106 S.Ct. at 2552; *Woodsmith*, 904 F.2d at 1247. However, if the court can conclude that a reasonable trier of fact could return a verdict for the nonmovant, then summary judgment should not be granted. *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510; *Burk*, 948 F.2d at 492; *Woodsmith*, 904 F.2d at 1247.

▪ The Eighth Circuit Court of Appeals has cautioned that "summary judgment should seldom be used in employment-dis-

entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Hartnagel*, 953 F.2d at 394.

crimination cases." *Crawford v. Runyon*, 37 F.3d 1338, 1341 (8th Cir.1994) (citing *Johnson v. Minnesota Historical Soc'y*, 931 F.2d 1239, 1244 (8th Cir.1991); *Hillebrand v. M-Tron Indus., Inc.*, 827 F.2d 363, 364 (8th Cir.1987), *cert. denied*, 488 U.S. 1004, 109 S.Ct. 782, 102 L.Ed.2d 774 (1989)); *see also Hardin v. Hussmann Corp.*, 45 F.3d 262 (8th Cir.1995) ("summary judgments should only be used sparingly in employment discrimination cases," citing *Haglof v. Northwest Rehabilitation, Inc.*, 910 F.2d 492, 495 (8th Cir. 1990); *Hillebrand*, 827 F.2d at 364). Summary judgment is appropriate only in "those rare instances where there is no dispute of fact and where there exists only one conclusion." *Crawford*, 37 F.3d at 1341 (quoting *Johnson*, 931 F.2d at 1244). The court reasoned that "[b]ecause discrimination cases often depend on inferences rather than on direct evidence, summary judgment should not be granted unless the evidence could not support any reasonable inference for the nonmovant." *Id.* (holding that there was a genuine issue of material fact precluding summary judgment); *Johnson*, 931 F.2d at 1244. With these standards in mind, the court turns to consideration of the Farmland's motion for summary judgment.

## III. FINDINGS OF FACT

### A. Undisputed Facts

The summary judgment record reveals that the following facts are undisputed. Vetter and his wife are adherents of the Jewish faith. Although Mrs. Vetter had been born into the Jewish faith, Vetter had converted to Judaism in a ceremony only about four months prior to Vetter's employment with Farmland. Prior to his employment with Farmland, Vetter and his family were living in Muscatine, Iowa, a town without a significant Jewish community. While living in Muscatine, the Vetters travelled approximately thirty miles to attend regular religious services. Farmland is an agricultural products company that sells supplies to the farming community. Farmland is a corporation owned by its member farm cooperatives. In its Webster City trade area, Farmland works with United Co-op, a member farm cooperative, to sell farming supplies to farmers in the area.

Vetter applied for a job with Farmland as a Livestock Production Specialist (LPS) in July of 1992. The principal job duties of an LPS are to work in conjunction with the management of the assigned cooperative to sell Farmland livestock feed and animal health products within the cooperative's trade territory. Vetter had an initial telephone interview with George Gleckler, Farmland's Area Feed Sales Manager. In-person interviews with Farmland officials followed in early and mid-August.

Vetter's mid-August interview was with Gleckler, Dave Engstrom, who was Farmland's LPS Supervisor, Al Jorth, the General Manager for the United Co-op, and Ken Bever, a Supervisor for the United Co-op. During this interview, Mr. Jorth asked how soon Vetter could start, and also asked about Vetter's interest in purchasing or renting housing. Mr. Jorth suggested that rental housing would be difficult to find. Following this interview, in a separate conversation, Gleckler informed Vetter that he "could live where he could find a house," which Vetter understood to mean anywhere within a reasonable distance of Webster City. The evening following the interview, Vetter and his wife drove around Webster City for approximately forty-five minutes looking for appropriate housing.

Gleckler offered Vetter the job in Webster City by telephone on August 21, 1992. In a follow-up telephone call on August 24, 1992, Vetter indicated that they had been looking for housing in Ames, approximately 35 miles from Webster City, because it had an active synagogue. Gleckler responded that Ames might be "a little far," but that he would check on it. Later that evening, Gleckler called Vetter back to inform him that he had found out that there was a synagogue in Fort Dodge, Iowa.

Vetter began working for Farmland on September 1, 1992, by attending a sales meeting in Des Moines, at which he again raised the issue of living in Ames with Gleckler. Gleckler reiterated that he thought Ames would not be acceptable. Again during meetings in Kansas City on September 9

and 10, 1992, Vetter discussed the possibility of living in Ames with Terry Allen, Farmland's Regional Feed Manager. Allen also indicated that Ames would not be an acceptable place for Vetter to live. Gleckler and Allen suggested that Vetter look further in Webster City and Fort Dodge. The Vetters rejected Fort Dodge after learning that the synagogue there was essentially "inactive," providing services only every few months, and that there was no Jewish community of significant size or activity. The Vetters also considered the only housing they had found in Webster City that was large enough to accommodate their whole family inadequate on the ground that they believed it was in a government subsidized complex for which they would not qualify and which they did not believe was adequate.

On September 21, 1992, Gleckler told Vetter that he had learned that Vetter was planning to rent housing in Ames. Vetter explained that he had put a small deposit on one residence in Ames. Vetter was therefore terminated effective September 21, 1992. Vetter asserts that he was not given any reason for his termination at the time he was discharged. The employee separation form filled out by Terry Allen has checked as the reason for discharge "other," and in the space provided for explanation states, "Relocation within trade territory was condition of employment. Employee refused to locate as required." Gleckler, Vetter's supervisor, testified in deposition that Vetter was terminated for "insubordination."[4] In answer to interrogatories from Vetter, Farmland identified as the reason for his discharge that Vetter "apparently was not willing to live within the trade territory he was responsible for servicing after having been informed as to the requirement and after having agreed to do so." Defendant's Answers To Plaintiff's First Set Of Interrogatories, No. 3.

### B. Disputed Facts

There are a number of factual disputes raised by the parties, some of which are material to disposition of this case. A key dispute in this matter is whether Farmland officials ever specifically told Vetter that Ames was an unacceptable place for him to live. Farmland asserts that Vetter was told on a number of occasions that Ames would not be acceptable. Vetter asserts that he was never told Ames was unacceptable, just that various people doubted that it would be acceptable, and that every time he raised the issue, it was apparent that Farmland officials preferred that he live closer to Webster City, because he was encouraged to keep looking in the surrounding area.

There is also a dispute as to the genuineness of any interest on the part of Farmland in having Vetter live within his trade area. Farmland asserts that it wants LPSs to live within their trade territories to facilitate business relationships by having the LPS become part of the community the LPS serves. Vetter asserts that this supposed interest is undermined by the fact that more than one LPS lives outside of his or her trade area.[5] Vetter asserts that the person hired to replace him lives outside of the Webster City territory. Gleckler testified in deposition that he thought Vetter's replacement "probably" lived outside of the trade area, but Farmland now asserts that Vetter's replacement does not live in Williams, Iowa, a town just outside of the trade area,[6] as Gleckler supposed, but to the west of Williams, and therefore within the trade area.

---

4. Gleckler's testimony was as follows:
 Q: So why then did you fire Dean?
 A: Because of the previous recommendation that he not move the family to Ames, and he went right around me and set the move up and made the lease [in Ames] anyway. That's direct insubordination.
 Gleckler Deposition, at p. 155.

5. Vetter has provided as part of the summary judgment record a list of Farmland LPSs, where they live, and what cooperatives they serve, which he obtained from Farmland in answer to

discovery requests, to which Vetter has added the approximate distances these LPSs live from cooperatives they serve. Some of these LPSs indisputably live further from cooperatives they serve than Vetter was proposing to live; however, the record does not establish whether these LPSs live inside or outside of their trade territories.

6. Williams is approximately fifteen miles east of Webster City and lies just east of the line Farmland has from time to time indicated is the eastern boundary of the Webster City trade area.

Juxtaposed to this dispute over the genuineness of Farmland's interest in where Vetter lives is the dispute of the parties over whether Vetter's desire to live in Ames was based on his religious beliefs or merely on personal preference. Vetter has provided the affidavit of Rabbi Stanley Herman, who affirms that "[l]iving in an active Jewish community with an active synagogue is essential to the sustenance of one's faith as a Jew, so much so it rises to the level of being a mitzvah (Jewish law)." However, Farmland points out that Vetter formerly lived in a community that had no such active Jewish community, and the court observes that a great many Jews in this area of the country do not live in such an "active Jewish community."

The parties also dispute the exact boundaries of the Webster City trade area. Vetter asserts that the boundaries are "amorphous," and subject to change depending upon who was seeking housing within the territory. Farmland has offered no positive identification of the area, only statements that Ames is not within the territory. According to the testimony of Farmland officials, Fort Dodge, which they suggested as an alternative, may or may not be within the trade territory.

Vetter also disputes the existence and enforcement of any "policy" requiring him to live within the trade area. There is no evidence of such a policy has been reduced to writing, and there is a dispute as to whether the policy is enforced consistently. Vetter points again to a number of LPSs living outside of their trade territories, or at considerably greater distances from cooperatives they serve than Vetter was proposing to live. Farmland counters that the policy has been enforced since Gleckler took over his present position, and that exceptions have been based on ownership of property by the LPS in question outside of the territory, which is recognized as reason for an exception. Vetter asserts that some LPSs have been given several months to move within their territories, but he was terminated after less than a month because he had not yet been able to find housing within the territory.

The parties also dispute the availability and definition of "suitable" housing in the Webster City trade area. Vetter states that he found little housing of any kind available either for sale or rent in Webster City, and that he doubted that his family would have qualified for housing suggested by Farmland, because it was government subsidized. Vetter admits that he considered the housing complex in question otherwise unacceptable for personal reasons. Farmland asserts that Vetter was unduly selective in his definition of suitable housing and made inadequate efforts to find housing within the trade territory.

The parties dispute the existence of any evidence that Vetter's religious beliefs were the target of or motivation for conduct by Farmland officials. Farmland asserts that, based on Vetter's deposition testimony, he never encountered any hostility from Farmland officials towards his religion or any suggestion that his religion motivated Farmland's decisions. Vetter asserts, to the contrary, that his religion had everything to do with Farmland's decisions, because it was only when he mentioned that he was Jewish that he encountered any difficulties about where he could live. Farmland asserts that it was the suggestion of Ames, because of its distance from Webster City, not the mention of Vetter's religion, that they found objectionable. Vetter also alleges a conversation between Gleckler and Vetter's wife in which Gleckler is alleged to have told Mrs. Vetter that sometimes one has to choose between one's religion and one's job.

Finally, the parties dispute whether any accommodation, if required, could be provided without undue hardship to Farmland. Farmland has offered no evidence of the costs accommodating Vetter's beliefs would have imposed upon them, relying instead on their "interest" in having LPSs live within their territories. Vetter argues that he offered to remove any costs to Farmland of accommodating his desire that his family live in Ames in two ways: first, he offered to take a room for himself in Webster City, but have his family live in Ames; second, he offered to pay the costs of any extra travel required because of his decision to live in Ames.

## IV. LEGAL ANALYSIS

Vetter's complaint alleges discrimination on the basis of religion on two theories. First, Vetter alleges that he was subjected to disparate treatment, because other LPSs have been allowed to live either outside of their trade areas or at greater distances from cooperatives that they serve than he would have been if allowed to live in Ames, and further that other LPSs were not terminated, whereas he was, for desiring to live or living outside of their trade areas. Second, Vetter alleges that Farmland refused to make reasonable accommodations to his religious observances or practices by refusing to allow him to live in Ames, or to allow him to live in Webster City while his family lived in Ames. The court will consider whether Farmland is entitled to summary judgment on either of these claims.

Title VII of the Civil Rights Act of 1964, as amended, prohibits an employer from discriminating against an employee on the basis of "race, color, *religion,* sex, or national origin." 42 U.S.C. § 2000e–2(a)(1) (emphasis added). *Beadle v. City of Tampa,* 42 F.3d 633, 636 (11th Cir.1995); *Beadle v. Hillsborough County Sheriff's Dep't,* 29 F.3d 589, 591 (11th Cir.1994), *petition for cert. filed,* 63 U.S.L.W. 3736 (Mar. 31, 1995) (No. 94–1610); *Cooper v. Oak Rubber Co.,* 15 F.3d 1375, 1378 (6th Cir.1994); *Heller v. EBB Auto Co.,* 8 F.3d 1433, 1437 (9th Cir.1993); *Brown v. General Motors Corp.,* 601 F.2d 956, 958 n. 1 (8th Cir.1979). The statute defines the term "religion" to include "all aspects of religious observance and practice, as well as belief." 42 U.S.C. § 2000e(j); *Brown v. General Motors Corp.,* 601 F.2d at 958 n. 1.

The Ninth Circuit Court of Appeals recently reiterated the scope of the religious practices or beliefs protected under Title VII:

Title VII protects more than the observance of Sabbath or practices specifically mandated by an employee's religion:

[T]he very words of the statute ("*all aspects* of religious observance and practice....") leave little room for such a limited interpretation.... [T]o restrict the act to those practices which are mandated or prohibited by a tenet of the religion, would involve the court in determining not only what are the tenets of a particular religion, ... but would frequently require the courts to decide whether a particular practice is or is not required by the tenets of the religion.... [S]uch a judicial determination [would] be irreconcilable with the warning issued by the Supreme Court in *Fowler v. Rhode Island,* 345 U.S. 67, 70 [73 S.Ct. 526, 527, 97 L.Ed. 828] (1953), [that] "[I]t is no business of courts to say ... what is a religious practice or activity."

*Redmond v. GAF Corp.,* 574 F.2d 897, 900 (7th Cir.1978)....

*Heller,* 8 F.3d at 1438 (some citations and explanatory parentheticals omitted).

The Supreme Court has stated that

The employer violates the statute unless it "demonstrates that [it] is unable to reasonably accommodate ... an employee's ... religious observance or practice without undue hardship on the conduct of the employer's business."

*Ansonia Bd. of Educ. v. Philbrook,* 479 U.S. 60, 68, 107 S.Ct. 367, 372, 93 L.Ed.2d 305 (1986) (quoting 42 U.S.C. § 2000e(j)); *Cooper,* 15 F.3d at 1378.

### A. Disparate Treatment

A disparate treatment case based on religion requires the plaintiff to show that he or she is, or was, treated less favorably than others because of the plaintiff's religion. *Mann v. Frank,* 7 F.3d 1365, 1370 (8th Cir. 1993) (citing *International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 335 n. 15, 97 S.Ct. 1843, 1854 n. 15, 52 L.Ed.2d 396 (1977)). Thus, the plaintiff in a disparate treatment case based on religion must prove that he or she is a member of a protected class and must compare his or her treatment to that of a similarly situated member of a non-protected class. *Id.* (citing *Hervey v. City of Little Rock,* 787 F.2d 1223, 1231 (8th Cir.1986)). The typical fashion for establishing a *prima facie* case of disparate treatment under Title VII is to apply the burden-shifting analysis found in *McDonnell Douglas* and its progeny. *See, e.g., Wileman v. Frank,* 979 F.2d 30, 33 (4th Cir.1992) (apply-

ing this analysis to disparate treatment claims under Title VII generally); *Donoghue v. Orange County*, 828 F.2d 1432, 1439 (9th Cir.1987) (*McDonnell Douglas* analysis applicable to all disparate treatment claims under Title VII), *as superseded and amended*, 848 F.2d 926, 932 (9th Cir.1987). Analysis of a claim of disparate treatment on the basis of religion under Iowa law is analyzed in the same fashion. *Boelman v. Manson State Bank*, 522 N.W.2d 73, 79 (Iowa 1994) (looking to federal Title VII cases for analytical framework for employment discrimination cases under Iowa Code § 216, formerly 601A); *Vaughn v. Ag Processing, Inc.*, 459 N.W.2d 627, 632 (Iowa 1990) (applying similar analysis to state-law religious discrimination claim); *King v. Iowa Civil Rights Comm'n*, 334 N.W.2d 598, 601 (Iowa 1983) (applying by analogy the same burdens and order of presentation of proof in chapter 601A religious discrimination case as used in Title VII cases).

### 1. The analytical framework for a disparate treatment claim

It is axiomatic that employment discrimination need not be proved by direct evidence, and indeed, that doing so is often impossible, because, as the Supreme Court has said, "There will seldom be 'eyewitness' testimony as to the employer's mental processes." *Gaworski v. ITT Commercial Fin. Corp.*, 17 F.3d 1104, 1108 (8th Cir.) (citing *United States Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 716, 103 S.Ct. 1478, 1482, 75 L.Ed.2d 403 (1983)), *cert. denied*, —— U.S. ——, 115 S.Ct. 355, 130 L.Ed.2d 310 (1994). Thus, in employment discrimination cases based on circumstantial evidence, courts apply the analytical framework of shifting burdens developed in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and refined in *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 252–53, 101 S.Ct. 1089, 1093–94, 67 L.Ed.2d 207 (1981), and most recently in *St. Mary's Honor Ctr. v. Hicks*, —— U.S. ——, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). *Gaworski*, 17 F.3d at 1108.

Under *McDonnell Douglas* and its progeny, the employment discrimination plaintiff has the initial burden of establishing a *prima facie* case of discrimination by producing evidence that would entitle the plaintiff to prevail unless contradicted and overcome by evidence produced by the defendant. *White v. McDonnell Douglas Corp.*, 985 F.2d 434, 435 (8th Cir.1993). To establish a *prima facie* case of discrimination under Title VII, the ADEA, or § 1983, the plaintiff must show that the defendant terminated the plaintiff under circumstances which give rise to an inference of unlawful discrimination. *Davenport v. Riverview Gardens Sch. Dist.*, 30 F.3d 940, 945 (8th Cir.1994) (Title VII race discrimination case); *Johnson v. Minnesota Historical Soc'y*, 931 F.2d 1239, 1242 (8th Cir.1991) (Title VII discriminatory discharge case).

If a *prima facie* case is established, the burden then shifts to the employer to rebut the presumption by producing evidence that the employer made the questioned employment decision for a legitimate, non-discriminatory reason. *White*, 985 F.2d at 435. The employer's explanation of its actions must be "clear and reasonably specific," *Burdine*, 450 U.S. at 258, 101 S.Ct. at 1096, but the employer's burden of production has nonetheless been held to be "exceedingly light." *Batey v. Stone*, 24 F.3d 1330, 1334 (11th Cir.1994) (citing *Meeks v. Computer Assocs. Int'l*, 15 F.3d 1013, 1019 (11th Cir. 1994)). If the employer meets this burden of production, the legal presumption that would justify a judgment as a matter of law based on the plaintiff's *prima facie* case "simply drops out of the picture," and the plaintiff bears the burden of persuading the finder of fact that the proffered reasons are pretextual and that the employment decision was the result of discriminatory intent. *St. Mary's*, —— U.S. at ——, 113 S.Ct. at 2749.

The Supreme Court has made clear that the ultimate inquiry is whether the employer intentionally discriminated against the plaintiff. *United States Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 715, 103 S.Ct. 1478, 1481–82, 75 L.Ed.2d 403 (1983); *White v. McDonnell Douglas Corp.*, 985 F.2d 434, 436 (8th Cir.1993); *United States v.*

*Johnson,* 28 F.3d 1487, 1494 (8th Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 768, 130 L.Ed.2d 664 (1995); *Johnson,* 931 F.2d at 1242; *Brooks v. Monroe Systems For Business, Inc.,* 873 F.2d 202, 204 (8th Cir.), *cert. denied,* 493 U.S. 853, 110 S.Ct. 154, 107 L.Ed.2d 112 (1989); *Washburn v. Kansas City Life Ins. Co.,* 831 F.2d 1404, 1408 (8th Cir.1987). However, if the defendant's proffered reasons are rejected, the trier of fact may infer the ultimate fact of intentional discrimination. *St. Mary's,* —— U.S. at ——, 113 S.Ct. at 2749 ("The factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination."); *Harvey v. Anheuser-Busch, Inc.,* 38 F.3d 968, 971 (8th Cir.1994) (quoting *St. Mary's* ); *EEOC v. Cherry-Burrell Corp.,* 35 F.3d 356, 361 (8th Cir.1994) (quoting *St. Mary's* ); *Gaworski,* 17 F.3d at 1109 (quoting *St. Mary's* ); *Hicks v. St. Mary's Honor Ctr.,* 2 F.3d 265, 266 (8th Cir.1994) (quoting *St. Mary's,* —— U.S. at ——, 113 S.Ct. at 2749); *Brooks,* 873 F.2d at 204 (submission by the employer of a discredited reason for discharging or failing to promote a person is itself evidence of discriminatory motive).

In two recent decisions, the Eighth Circuit Court of Appeals has considered in more detail the plaintiff's burden to show discriminatory intent when the employer has offered a legitimate, non-discriminatory reason for its actions. *See Lidge-Myrtil v. Deere & Co.,* 49 F.3d 1308 (8th Cir.1995); *Krenik v. County of Le Sueur, Minn.,* 47 F.3d 953 (8th Cir.1995). In *Krenik,* the court held that

> [t]o survive summary judgment at the third stage of the *McDonnell Douglas* analysis, a plaintiff must demonstrate the existence of evidence of some additional facts that would allow a jury to find that the defendant's proffered reason is pretext and that the real reason for its action was intentional discrimination. *St. Mary's Honor Center,* —— U.S. at ——, 113 S.Ct. at 2747. These additional facts may be limited solely to proof of pretext....

*Krenik,* 47 F.3d at 958; *Lidge-Myrtil,* 49 F.3d at 1310-11 (the plaintiff "must produce 'some additional evidence beyond the elements of the *prima facie* case' that would allow a rational jury to reject [the employer's] proffered reasons as a mere pretext for discrimination," quoting *Krenik* ). In *Krenik,* the court noted that the "additional facts" could be limited to evidence that would cast disbelief and a suspicion of mendacity upon the employer's proffered legitimate reasons, citing *St. Mary's Honor Center,* —— U.S. at ——, 113 S.Ct. at 2749, but the court held that the plaintiff must produce "some additional evidence beyond the elements of the *prima facie* case to support a finding of pretext. Thus, [plaintiff's] argument that she was entitled to a full trial once both parties had met their initial burdens fails as a matter of law." *Krenik,* 47 F.3d at 959. In *Lidge-Myrtil,* the court held, first, that the plaintiff's abilities alone cannot rebut the employer's stated reasons for its action. *Lidge-Myrtil,* 49 F.3d at 1310-11. Next, the court rejected as inadequate plaintiff's "additional facts" in the form of a "single offhand hearsay comment by an unnamed co-worker" offered as proving discriminatory animus on the part of the employer. *Id.* at 1311-12. Finally, the plaintiff was unable to produce persuasive evidence of disparate treatment because she could identify no comparably situated employees not of her protected class who were treated differently. *Id.*

The court will therefore consider, if Vetter presents an adequate *prima facie* case of disparate treatment because of his religion, if he has also presented "additional facts" to rebut the defendants' proffer of a legitimate, non-discriminatory reason for his discharge sufficient to create a genuine issue of material fact as to discriminatory intent. However, the finding of discriminatory intent is generally for the trier of fact. *Burger v. McGilley Memorial Chapels, Inc.,* 856 F.2d 1046, 1047 (8th Cir.1988).

### 2. The prima facie case

The court must next determine the proper *prima facie* case for Vetter's claim of disparate treatment because of religion. The importance of the *prima facie* showing is that it creates the inference that the employer terminated the plaintiff for an

impermissible reason. *Hardin,* 45 F.3d at 264. However, the *prima facie* case criteria differ for each type of employment decision. *Davenport,* 30 F.3d at 944; *Hervey v. City of Little Rock,* 787 F.2d 1223, 1231 (8th Cir. 1986). Thus, in a case alleging religious discrimination, the usual elements of the *prima facie* case are: (1) that the plaintiff was a member of a protected group on the basis of his or her religion; (2) that the plaintiff was performing his or her job at a level that met the employer's legitimate expectations; (3) that plaintiff was discharged; and 4) that the employer replaced or attempted to replace the plaintiff with someone not a member of plaintiff's religion. *Ricks v. Riverwood Int'l Corp.,* 38 F.3d 1016, 1018 (8th Cir.1994) (only stating first three elements of *prima facie* case of disparate treatment); *Gaworski,* 17 F.3d at 1109 (all four elements for claim of disparate treatment because of age). In *Williams v. Ford Motor Co.,* 14 F.3d 1305 (8th Cir.1994), the court required all four of the elements listed above in a disparate treatment claim based on race, but stated that "Title VII has been interpreted to require only that, in addition to the first three elements of the *McDonnell Douglas* test, a plaintiff show that his or her discharge occurred under circumstances which create an inference of unlawful discrimination." *Williams,* 14 F.3d at 1307. The court held that the discharge must only be for reasons related to the person's protected class, such as race or religion. *Id.* Thus, *Williams* determined that the proper elements of the *prima facie* case for a disparate treatment claim are (1) the plaintiff was a member of a protected class, (2) the plaintiff was qualified for the position, but (3) was fired or denied an employment benefit, and (4) similarly situated employees outside of the plaintiff's protected class were treated differently. *Id.* (but conflating the second and third elements in the circumstances of a reinstatement case as "qualified for but denied reinstatement").

In religious discrimination cases under Title VII, some courts, including the Eighth Circuit Court of Appeals, have held that in order to establish a *prima facie* case, the employee must also demonstrate that the employee informed the employer of his or her religious beliefs. *Johnson v. Angelica Uniform Group, Inc.,* 762 F.2d 671, 673 (8th Cir.1985) (employee who never informed employer of religious beliefs failed to make out *prima facie* case of religious discrimination); *Brown v. General Motors Corp.,* 601 F.2d 956, 959 & n. 4 (8th Cir.1979); *Chrysler Corp. v. Mann,* 561 F.2d 1282, 1285 (8th Cir.1977), *cert. denied,* 434 U.S. 1039, 98 S.Ct. 778, 54 L.Ed.2d 788 (1978) (employee claiming religious discrimination has duty to acquaint the employer "with his religion and its potential impact upon his ability to perform his job."); *see also Hedberg v. Indiana Bell Telephone Co., Inc.,* 47 F.3d 928, 933 (7th Cir.1995) (disability discrimination case finding an analogous requirement, and citing *Beasley* and *Redmond, infra.*); *Beasley v. Health Care Serv. Corp.,* 940 F.2d 1085, 1088 (7th Cir.1991) (religious discrimination case); *Redmond v. GAF Corp.,* 574 F.2d 897, 901–02 (7th Cir.1978) (religious discrimination case).

 Thus the court concludes that the elements of a *prima facie* case of disparate treatment because of religion are as follows: (1) the plaintiff was a member of a protected class because of the plaintiff's religious affiliation or beliefs; (2) the employee informed the employer of his or her religious beliefs; (3) the plaintiff was qualified for the position; (4) despite the plaintiff's qualifications, the plaintiff was fired or denied an employment benefit; and (5) similarly situated employees outside of the plaintiff's protected class were treated differently or there is other evidence giving rise to an inference of discrimination.

### 3. *Vetter's prima facie case*

The court concludes that Vetter has satisfied the requirements of his *prima facie* showing of disparate treatment because of religion, or at least has established a genuine issue of material fact as to each element.[7] First, Vetter is a member of a protected

---

7. Farmland did not appear to dispute that Vetter had made a *prima facie* showing, although they strenuously argued that they had a legitimate reason for terminating Vetter that had nothing to do with his religion. Specifically, they argue that Vetter was fired for refusing to live within his trade area and instead taking steps to live in Ames.

class based on religion. There appears to be no dispute that Vetter is Jewish and that being Jewish places him in a protected class. Second, Vetter informed Farmland that he was Jewish when he indicated that availability of a synagogue and active Jewish community were the reasons he wished to live in Ames. Third, Vetter was qualified for the position at Farmland, or he has established a genuine issue of material fact that he was qualified, because he was hired by Farmland after Farmland officials interviewed him and considered his qualifications, Farmland has never argued that Vetter did not meet the qualifications for the position. Fourth, Vetter was undeniably discharged. Thus only one element of Vetter's *prima facie* case requires somewhat more thorough discussion, that similarly situated employees outside of the plaintiff's protected class were treated differently or that Vetter can make some showing giving rise to an inference of discrimination.

Farmland could argue that there is no inference of discrimination in this case, because Vetter was hired and fired by essentially the same person or persons, specifically Gleckler. In *Tyndall v. National Educ. Ctrs., Inc. of Cal.*, 31 F.3d 209 (4th Cir.1994), in the context of an ADA action, the Fourth Circuit Court of Appeals adopted the inference that where the person hiring and the person firing are the same person, " 'there is a powerful inference relating to the 'ultimate question' that discrimination did not motivate the employer....' " *Tyndall*, 31 F.3d at 214–215 (quoting from *Proud v. Stone*, 945 F.2d 796, 797 (4th Cir.1991)). The Eighth Circuit Court of Appeals has followed the rule in *Proud* in *Lowe v. J.B. Hunt Transp., Inc.*, 963 F.2d 173 (8th Cir.1992). This court has previously considered the applicability of this inference to cases under the ADEA and ADA. *See Susie v. Apple Tree Preschool & Child Care Ctr.*, 866 F.Supp. 390, 396 (N.D.Iowa 1994) (suggesting that the inference is less applicable to ADA cases than to ADEA cases); *Holmes v. Marriott Corp.*, 831 F.Supp. 691, 699–702 (S.D.Iowa 1993) (finding that in an ADEA case, the *Proud–Lowe* rule "should not be applied in an iron clad fashion.").

The court finds that the presumption should be considered with some hesitation in a religious discrimination case, because of the requirement that the employer know of the plaintiff's religious beliefs before taking the adverse action of which plaintiff complains. This case is an illustration. The fact that the same person, Gleckler, was involved in both Vetter's hiring and his firing within a very short time frame could give rise to a presumption that impermissible discrimination was not the reason for the termination. However, if Gleckler did not know of Vetter's religious affiliation at the time he hired him, as the undisputed record here shows to be the case, application of the *Proud/Lowe* presumption would be unwarranted. Vetter asserts that everything about his relationship with Gleckler and Farmland changed once he informed Gleckler of his religious affiliation. There is therefore at least a genuine issue of material fact as to whether the subsequent decision to terminate Vetter, although made by the same decision-maker who hired him, was made because of Vetter's religion, and therefore discriminatory.

Vetter has also presented sufficient evidence to preclude summary judgment by generating a genuine issue of material fact that he was discharged while similarly situated persons were treated differently. Vetter has presented evidence suggesting, at the very least, that other LPSs who did not live within their trade territories, but for reasons other than religion, were either allowed to stay there or given significantly longer than was Vetter to move within the territory. Farmland claims that these cases are distinguishable, because Vetter was a new employee, not an existing one faced with a change in policy. However, the court believes that such a distinction is insufficient, because a new employee moving into an area may face hurdles just as significant in locating appropriate housing as would an existing employee required to uproot and move into his or her trade area. Thus, the court concludes that Vetter has, at the least, generated a genuine issue of material fact as to each element of his *prima facie* case of disparate treatment.

### 4. Pretext

Farmland argues that Vetter was discharged for refusing to live within his trade area as required, and that such a policy was legitimate. Vetter argues, first, that Farmland has given inconsistent reasons for Vetter's termination, and that substantial changes over time in the employer's proffered reason for its employment decision support a finding of pretext, citing *Kobrin v. University of Minnesota,* 34 F.3d 698, 703 (8th Cir.1994). Vetter asserts that he was initially given no reason for his discharge. Vetter also points out that while Gleckler identified the reason for Vetter's discharge was "insubordination," the separation form does not indicate "insubordination" or even "violation of company policy" as the reason for his termination, although both choices were available in the listing of grounds on the form. Vetter also points out that the reason given by Farmland in answers to interrogatories was that Vetter was apparently not willing to live within his trade territory after having been informed of such a requirement and having agreed to do so.

The court sees these "changes" in the reason for Vetter's termination as little more than semantic games concerning how the reason is denominated. Examining the full text of the separation form, the answer to the interrogatory, and Gleckler's deposition testimony, it appears to the court that the motivating factor stated in each case was that Vetter had refused to live within his trade territory. However, the court concludes that a jury is entitled to determine the question of whether or not Farmland gave varying reasons for its decision to terminate Vetter. The court finds other questions more likely to be determinative, including questions upon which it finds a genuine issue of material fact. These questions include whether Vetter had in fact refused to live within his trade area, or had only been unable to find housing within the territory and was attempting to explore alternatives, whether living within the trade area was in fact a requirement of Vetter's position, what the precise terms of such a requirement were, and whether the requirement was communicated to Vetter prior to his hiring. If such a requirement was only developed after Vetter indicated a desire to live in Ames, never communicated to Vetter, or one with shifting terms as Vetter attempted to explore housing alternatives, Vetter may well be able to demonstrate that the requirement, and his termination for violating it, were a pretext for religious discrimination. Vetter asserts, for example, that the range of acceptable housing locations shrank from "anywhere you can find a house," to "not Ames," to "only within the trade area," to "in Webster City." Vetter also points out that the trade area was "amorphous," with boundaries that changed depending on who was asking and when they asked. For example, Vetter asserts, and the court finds, that there is a genuine issue of material fact as to whether Fort Dodge was or was not within the trade area and whether, even if it was outside the trade area, it was an acceptable alternative to Farmland to Webster City.

Furthermore, the court finds that Vetter offered "some additional evidence" to rebut Farmland's proffered legitimate reason as pretextual. Specifically, Vetter asserts that Gleckler told Mrs. Vetter that "sometimes you have to choose between your religion and your job." Such a statement suggests that the requirement that Vetter live within his trade area was either intended or understood to present Vetter with an unpalatable choice because of his religion. Vetter has also generated a genuine issue of material fact concerning the genuineness of the requirement that he live within his trade area because of the numerous apparent exceptions to that policy he has been able to identify and the suspect justifications for those exceptions offered by Farmland. Similarly, no other LPS was fired for failure to comply with the policy, and some were given much longer than was Vetter to comply with it. Finally, the court concludes that Vetter's efforts to make Ames a viable solution to the housing problem at no cost to Farmland, either by paying for his own extra travel costs or by living in Webster City himself while his family lived in Ames, and Farmland's rejection of those efforts, generates a genuine issue of material fact as to whether the policy was imposed for legitimate business reasons, or simply to discriminate against Vetter because of his de-

sire to live in Ames for religious reasons. The court concludes that Vetter has also demonstrated various genuine issue of material fact precluding summary judgment on the issue of pretext.

■ Because Vetter has established a genuine issue of material fact concerning both his *prima facie* case of disparate treatment and on the issue of whether Farmland's proffered legitimate reason for its decision is pretextual, the court concludes that Farmland is not entitled to summary judgment on Vetter's claims of disparate treatment under federal and state law. The court therefore turns to the question of whether Farmland is entitled to summary judgment on Vetter's claims of failure to make reasonable accommodations to his religious beliefs.

### B. Failure To Accommodate

In his complaint, Vetter argues that Farmland refused to make reasonable accommodation to his religious beliefs, because Farmland refused to consider his suggestion that he maintain a residence for himself in Webster City, while his family lived in Ames. Vetter has since argued that he also suggested as a reasonable accommodation that he bear any additional costs of his travel to his trade area that might result if he and his family were to live in Ames. Farmland argues that nothing about Vetter's religion required him to live in Ames, or outside of his trade area, therefore it was under no obligation to provide any accommodation. Farmland has also, at least implicitly, suggested that by pointing out that Fort Dodge had a synagogue and that Vetter could live there, they offered a reasonable accommodation.

### 1. The analytical framework for a failure to accommodate claim

■ Vetter's claim of failure to accommodate his religion also involves a burden-shifting analysis. In order to establish a *prima facie* case of religious discrimination under 42 U.S.C. § 2000e–2(a)(1) (prohibited practices) & (j) (accommodation requirement), a plaintiff must plead and prove that (1) the plaintiff has a bona fide belief that compliance with an employment requirement is con-

trary to his religious faith; (2) the plaintiff informed the plaintiff's employer about the conflict; and (3) the plaintiff was discharged because of the plaintiff's refusal to comply with the employment requirement. *Johnson v. Angelica Uniform Group, Inc.*, 762 F.2d 671, 673 (8th Cir.1985) (where plaintiff fails the notice requirement of the *prima facie* case, the court need not consider any other element); *Brown v. General Motors Corp.*, 601 F.2d 956, 959 (8th Cir.1979); *see also Cooper*, 15 F.3d at 1378 (same *prima facie* case); *Heller*, 8 F.3d at 1438 (same *prima facie* case); *EEOC v. Arlington Transit Mix, Inc.*, 957 F.2d 219, 221 (6th Cir.1991) (same *prima facie* case); *Beasley v. Health Care Serv. Corp.*, 940 F.2d 1085, 1088 (7th Cir. 1991) (same *prima facie* case). The same analysis is used in religious discrimination cases under Iowa law. *King v. Iowa Civil Rights Comm'n*, 334 N.W.2d 598, 601 (Iowa 1983).

■ Once a plaintiff establishes a *prima facie* case of religious discrimination, the burden shifts to the employer to show that it could not reasonably accommodate the employee without undue hardship. *Cooper*, 15 F.3d at 1378; *Heller*, 8 F.3d at 1438, 1440 (Title VII religious discrimination claims analyzed under two-part framework: whether plaintiff has established the *prima facie* case described above, and then "if the employee proves a prima facie case, the employer must establish that it initiated good faith efforts to accommodate the employee's religious practices," and citing cases discussing the employer's burden to show "some initial step to reasonably accommodate the religious belief of that employee."); *Arlington Transit Mix, Inc.*, 957 F.2d at 221 (6th Cir.1991) (describing this "two-step analysis" in evaluating claims of religious discrimination).

### 2. Vetter's prima facie showing

To reiterate, Vetter must make the following *prima facie* showing in support of his claim of failure to accommodate his religion: (1) Vetter has a bona fide belief that compliance with an employment requirement is contrary to his religious faith; (2) Vetter informed Farmland about the conflict; and (3)

Vetter was discharged because of his refusal to comply with the employment requirement. The court will consider each of these elements in turn.

### a. Bona fide belief

At oral arguments, the court questioned Vetter's counsel on the extent to which the court is allowed to inquire into the sincerity of the plaintiff's religious beliefs and the relationship between the asserted belief and the plaintiff's religion to see if the first element of the *prima facie* case has been established. Vetter's counsel opined that the issue was only whether the plaintiff sincerely held the belief, not whether the belief was a tenet of the religion or a matter of religious law.

The court has found few cases instructive on this point. The warnings issued by the Sixth Circuit Court of Appeals in *Heller* concerning the extent to which the court may make inquiry into whether a practice or belief is a tenet of the plaintiff's religion, quoted above beginning at page 1299, are instructive here. *Heller*, 8 F.3d at 1438 (finding that participation in religious conversion ceremony was protected by Title VII). Under *Heller*, the court may not determine which practices are mandated or prohibited by a tenet of the religion: the court may neither determine what the tenets of a particular religion are, nor decide whether a particular practice is or is not required by the tenets of the religion. *Id.* Such a judicial determination would be irreconcilable with the warning issued by the Supreme Court in *Fowler v. Rhode Island*, 345 U.S. 67, 73 S.Ct. 526, 97 L.Ed. 828 (1953), in which the Court held that "it is no business of courts to say ... what is a religious practice or activity." *Fowler*, 345 U.S. at 70, 73 S.Ct. at 527; *Heller*, 8 F.3d at 1438 (quoting *Fowler*).

Furthermore, the court in *Heller* gauged the sincerity of the plaintiff's belief in the importance of a particular practice in part by the plaintiff's willingness to sacrifice his job to pursue the practice, rather than looking at the tenets of the religion to decide whether the plaintiff's practice was required by those tenets. *Id.* at 1439. Nor would the court in *Heller* allow the *employer* to "delve into the religious practices of an employee in order to determine whether religion mandates the employee's adherence," because "[i]f courts may not make such an inquiry, *see Fowler*, 345 U.S. at 70, 73 S.Ct. at 527; *Redmond*, 574 F.2d at 900, then neither should employers." *Id.*

 This latter theme was taken up again by the Sixth Circuit Court of Appeals in *Cooper*, 15 F.3d 1375. In *Cooper*, in a case involving a Seventh Day Adventist seeking accommodation to avoid working on Saturday, her sabbath, the appellate court stated that the district court's findings concerning the sincerity of the plaintiff's religious beliefs are reviewed for "clear error," and the appellate court "will not disturb such a finding unless, after examining the entire record, it is left with the definite and firm conviction that a mistake has been made." *Cooper*, 15 F.3d at 1378–79 (citing *Smith v. Pyro Mining Co.*, 827 F.2d 1081, 1086 (6th Cir.1987), *cert. denied*, 485 U.S. 989, 108 S.Ct. 1293, 99 L.Ed.2d 503 (1988)). The court found such an error in the district court's conclusions:

> In scrutinizing [plaintiff's] sincerity in objecting to Saturday work, the district court focused on the fact that [plaintiff] had worked the Friday night shift for approximately seven months after her baptism in 1984. However, seventeen months intervened before [plaintiff] was next required to work on a Saturday, and [plaintiff's] undisputed testimony was that her faith and commitment to her religion grew during this time. There was no evidence that [plaintiff's] activities on Saturdays were inconsistent with her religious beliefs or otherwise indicated that [plaintiff] did not genuinely and sincerely adhere to the tenets of her faith. Under these circumstances, we conclude that the district court erred in finding that [plaintiff's] religious beliefs were not sincere, and in holding that [plaintiff] had not established a prima facie case of discrimination.

*Cooper*, 15 F.3d at 1379. Thus, the court may not discount sincerity of the plaintiff's religious beliefs simply because of prior inconsistent behavior, at least not where there is evidence that the plaintiff's faith or commitment grew prior to the time he or she

asserts that a religious belief is incompatible with a requirement of employment.

■■■ The court concludes that although these decisions make it clear that the court's inquiry into the content of religious beliefs is severely limited, and the court may not look to whether the plaintiff's religion mandates or requires the practice in question, the court may nonetheless note whether there is any connection between the plaintiff's religion and the asserted belief or practice. Title VII "does not require an employer to reasonably accommodate the purely personal preferences of its employees." *Brown v. General Motors Corp.*, 601 F.2d 956, 960 (8th Cir.1979). Thus, the court must be allowed, at a minimum, to ascertain whether the practice asserted by the plaintiff is purely personal, or does indeed have some connection with the plaintiff's religion. In both *Heller* and *Cooper*, the Sixth Circuit Court of Appeals inferred the sincerity of the plaintiff's religious beliefs from their conduct in pursuit of religious observances in the form of specific religious services. Where the practice asserted by the plaintiff is not so obviously a religious observance or service, however, as is the case here, the court must be allowed at least some minimal inquiry to determine whether the practice is connected with the plaintiff's religion, or merely motivated by personal preference.

■■■ The court finds guidance for the nature of the inquiry in the *Heller* court's discussion of the *second* element of the *prima facie* case, the notice requirement. In addressing the notice requirement, the Sixth Circuit Court of Appeals held that a "sensible approach" would "require only enough information about an employee's religious needs to permit the employer to understand the existence of a conflict between the employee's religious practices and the employer's job requirements." *Heller*, 8 F.3d at 1439. Thus, as to the *first* element of the *prima facie* case, the court concludes that a "sensible approach" would *require the plaintiff to come forward with only enough information to demonstrate a connection between the employee's practice and the employee's professed religion.*

The court finds that Vetter has come forward with more than the minimal amount of information required to demonstrate such a connection here. Vetter has provided the affidavit of Rabbi Stanley Herman, who affirms that "[l]iving in an active Jewish community with an active synagogue is essential to the sustenance of one's faith as a Jew, so much so it rises to the level of being a mitzvah (Jewish law)." There, the court's inquiry as to this element of Vetter's *prima facie* case must end. To go further would run afoul of the warning issued by the Supreme Court in *Fowler v. Rhode Island*, 345 U.S. 67, 73 S.Ct. 526, 97 L.Ed. 828 (1953), in which the Court held that "it is no business of courts to say ... what is a religious practice or activity," *Fowler*, 345 U.S. at 70, 73 S.Ct. at 527, or the warning in *Thomas v. Review Bd. of the Indiana Employment Security Div.*, 450 U.S. 707, 101 S.Ct. 1425, 67 L.Ed.2d 624 (1981), that in determining whether the religious beliefs of the plaintiff are sincerely held, the court will not second-guess the acceptability, logic, consistency, or comprehensibility of these beliefs, because "[c]ourts are not arbiters of scriptural interpretation." *Thomas*, 450 U.S. at 714, 716, 101 S.Ct. at 1430, 1431. The court believes that it would also be inappropriate to probe into the prevalence of the belief or practice among adherents to the plaintiff's religion, because to do so would, again, make the court something of an arbiter of orthodoxy, which would be a constitutionally impermissible inquiry. The court is satisfied in this case that the asserted belief is indeed sufficiently connected with Vetter's religion to be a "religious observance [or] practice," § 2000e–2(a)(1), rather than merely a personal preference.

■■■ As to sincerity of his belief, then, the court looks to Vetter's conduct. *Cooper*, 15 F.3d at 1379; *Heller*, 8 F.3d at 1439. Farmland asserts that because Vetter previously lived in a community without a significant Jewish population, and drove over thirty miles to attend religious services, Vetter cannot now, simply because he has the opportunity to move, assert as a sincerely held religious belief the need to live in a community with a significant and active Jewish population. The court finds *Cooper* to be disposi-

tive on this issue: Vetter was a recent convert to Judaism, and his children were endeavoring to pursue religious training in that faith.[8] Thus, the growth of the family's faith during the period in question is uncontradicted. *Cooper*, 15 F.3d at 1379. Because Vetter was a recent convert to Judaism, the court finds that his prior conduct in Muscatine is of little relevance to the question of the sincerity of his belief in a need to live in a Jewish community. To the extent that it is relevant, the court finds that the Vetters' uncontradicted testimony is that even had Vetter not taken the job with Farmland, they would have attempted to move to the Quad Cities area, because of its active Jewish community. Their evidence, again uncontroverted, is that their plans to move to the Quad Cities for this reason before Vetter was offered the job with Farmland were thwarted by floods in the area. Furthermore, the sincerity of Vetter's belief is reinforced by his conduct of asserting the belief in the face of opposition from his employer, and in his offers to provide for that belief at some expense and personal cost in his offers either to pay an extra travel costs or to live in Webster City while his family lives in Ames. *Heller*, 8 F.3d at 1439. Thus, the court finds as a matter of law that Vetter's religious beliefs in question here were indeed sincerely held.

### b. Notice to the employer and discharge

The second and third elements of Vetter's *prima facie* case need not detain the court long. As the court noted above, the Sixth Circuit Court of Appeals held that a "sensible approach" would "require only enough information about an employee's religious needs to permit the employer to understand the existence of a conflict between the employee's religious practices and the employer's job requirements." *Heller*, 8 F.3d at 1439. Here, Vetter supplied the necessary notice to Farmland in his conversation with Gleckler in which he indicated his desire to explore Ames as an alternative place of residence and the reasons for that desire.

8. Vetter's affidavit and supplemental affidavit state that his son was attempting to complete his bar mitzvah training to become a full member of

As to the third element, there is no dispute that Vetter was discharged because of noncompliance with the employment requirement that he live within his trade area. Thus, the court concludes that Vetter has established at least a genuine issue of material fact on the elements of his *prima facie* case of failure to accommodate. The court therefore turns to the second prong of the analysis of this religious discrimination claim, whether Farmland failed to provide reasonable accommodation.

### 3. Accommodation

Title VII requires "reasonable accommodation" of an employee's religious beliefs in 42 U.S.C. § 2000e(j), but adds that the accommodation must not impose "undue hardship on the conduct of the employer's business." 42 U.S.C. § 2000e(j). However, because the phrases "reasonable accommodation" and "undue hardship" are not defined under Title VII, " '[e]ach case necessarily depends upon its own facts and circumstances, and *in a sense every case boils down to a determination as to whether the employer has acted reasonably.*' " *Beadle v. City of Tampa*, 42 F.3d at 636 (quoting *United States v. City of Albuquerque*, 545 F.2d 110, 114 (10th Cir.1976), *cert. denied*, 433 U.S. 909, 97 S.Ct. 2974, 53 L.Ed.2d 1092 (1977); emphasis added).

#### a. The two-step analysis

It is apparent from decisions of the Eighth Circuit Court of Appeals and other courts that analysis of a claim of failure to accommodate has two prongs: first, whether accommodation is possible; and, second, whether that accommodation is "reasonable." *See, e.g., Mann*, 7 F.3d at 1368–70; *accord Cooper*, 15 F.3d at 1379–80 ("dispositive issue" was whether employer "could have made any accommodation" of plaintiff's religious beliefs, and where it could, but to do so would have imposed more than de minimis cost, employer was relieved of obligation to accommodate). No accommodation is "reasonable" if it imposes "undue hardship" upon

the Jewish faith and his daughter was also actively pursuing religious training in the Jewish faith.

the employer. *Id.* at 1369; *see also Lee v. ABF Freight Sys., Inc.,* 22 F.3d 1019, 1023 (10th Cir.1994) ("An employer has the 'statutory obligation to make reasonable accommodation for the religious observances of its employees, short of incurring an undue hardship,'" quoting *Hardison,* 432 U.S. at 75, 97 S.Ct. at 2272). In *Heller,* the court stated bluntly that "[t]he employer need not make such an effort [to accommodate religious beliefs of an employee] if it can show that any accommodation would impose undue hardship." *Heller,* 8 F.3d at 1440.

### b. "Reasonable accommodation" and "undue hardship"

■ The Eighth Circuit Court of Appeals recently identified the standards applicable to the court's inquiry into what constitutes reasonable accommodation of religion as follows:

> In *Trans World Airlines, Inc. v. Hardison,* 432 U.S. 63, 97 S.Ct. 2264, 53 L.Ed.2d 113 (1977) (*Hardison*), the Supreme Court addressed the extent of an employer's obligation to reasonably accommodate an employee's religious needs under § 701(j) of Title VII[, 42 U.S.C. § 2000e(j) ]. Section 701(j) provides that employers must "reasonably accommodate" the religious beliefs or practices of their employees unless doing so would cause the employers to suffer undue hardship. 432 U.S. at 75, 97 S.Ct. at 2272. . . .
>
> Although neither a collective bargaining agreement nor a seniority system may be employed to violate Title VII, the Court concluded that the duty to reasonably accommodate does not require an employer to jeopardize its overall labor scheme by compromising the contractual seniority rights of other employees as secured by a collective bargaining agreement. *Id.* at 79, 97 S.Ct. at 2274. "It is anomalous to conclude that by 'reasonable accommodation' Congress meant that an employer must deny the shift and job preferences of some employees, as well as deprive them of their contractual rights, in order to accommodate or prefer the religious needs of others." *Cook v. Chrysler Corp.,* 981 F.2d 336, 338 (8th Cir.1992) (*Cook*) (quoting

*Hardison,* 432 U.S. at 81, 97 S.Ct. at 2275). . . .

> *Hardison* held that any accommodation involving more than de minimis costs to the employer constitutes undue hardship. *Hardison,* 432 U.S. at 84, 97 S.Ct. at 2276. The district court found that [the plaintiff's] suggested accommodation would have resulted in more than de minimis costs to the [defendant employer]. We upset the district court's fact findings of undue hardship and de minimis costs only if they are clearly erroneous. *Cook,* 981 F.2d at 339.

*Mann,* 7 F.3d at 1368–69; *Cook v. Chrysler Corp.,* 981 F.2d 336, 338–39 (8th Cir.1992) (citing similar standards, and also relying on *Hardison*), *cert. denied,* —— U.S. ——, 113 S.Ct. 2963, 125 L.Ed.2d 663 (1993). The court then found that an accommodation that required contravention of a collective bargaining agreement constituted undue hardship, as did requiring other employees to absorb the plaintiff's work load by working extra time. *Id.* at 1369–70; *see also Cook,* 981 F.2d at 338. Furthermore, " '[a]ny cost in efficiency or wage expenditures that is more than de minimis constitutes undue hardship.' " *Id.* at 1370 (quoting *Hardison,* 432 U.S. at 84, 97 S.Ct. at 2277); *Cook,* 981 F.2d at 339 (more than de minimis cost to employer makes accommodation an undue hardship).

■ An employer's costs of accommodation "must mean present undue hardship, as distinguished from anticipated or multiplied hardship." *Cook,* 981 F.2d at 339 (quoting *Brown v. General Motors Corp.,* 601 F.2d 956, 962 (8th Cir.1979)). Thus, there must be "evidence of tangible present costs" of the accommodation, not speculative evidence of future impact calculated with an assumption that more employees would seek such accommodation for religious reasons. *Id.* The costs need not be ascertained with exactitude, but must be "present and real." *Id.* The Supreme Court has stated that "the extent of undue hardship on the employer's business is at issue only where the employer claims that it is unable to offer any reasonable accommodation without such hardship." *Ansonia,* 479 U.S. at 68–69, 107 S.Ct. at 372.

The Eighth Circuit Court of Appeals has also held that § 2000e–2(a)(1) "does not require an employer to reasonably accommodate the purely personal preferences of its employees." *Brown · v. General Motors Corp.*, 601 F.2d 956, 960 (8th Cir.1979) (making clear that in calculating the costs of accommodation, the employer may not include excusing vast numbers of employees who wish to have similar accommodations for non-religious reasons).

 Finally, differential treatment resulting from accommodation may itself run afoul of section 2000e–2(a)(1), which sets forth unlawful employment practices under Title VII. *See Cook*, 981 F.2d at 338; *Brown v. General Motors Corp.*, 601 F.2d 956, 962 (8th Cir.1979). Title VII's prohibition of disparate treatment does not provide a *per se* proscription against any and all forms of differential treatment based on religion, however. *Brown v. General Motors*, 601 F.2d at 961 (finding *Hardison* does not go this far in prohibiting differential treatment in its formulation of reasonable accommodation). Thus, "finding that a proposed accommodation would entail some form of discrimination does not end the inquiry." *Id.* Rather, it is only where the accommodation (1) compromises other employees' contractual seniority rights as secured by a collective bargaining agreement; or (2) confers a privilege, the cost of which is more than de minimis, solely on the basis of the recipient's religious beliefs, that it offends Title VII's prohibitions on disparate treatment. *Cook*, 981 F.2d at 338; *Brown v. General Motors Corp.*, 601 F.2d at 962.

 Once an employer demonstrates that it reasonably accommodated an employee's religious needs, the statutory inquiry ends. *Ansonia*, 479 U.S. at 68, 107 S.Ct. at 371–72; *Beadle v. City of Tampa*, 42 F.3d at 636; *Beadle v. Hillsborough County Sheriff's Dep't*, 29 F.3d at 593. Similarly, where accommodation is not possible without undue hardship, the inquiry ends. 42 U.S.C. § 2000e(j); *Cooper*, 15 F.3d at 1378.

### c. *The employee's duty to cooperate*

 Compliance with Title VII does not require an employer to give an employee a choice among several accommodations, nor is the employer required to demonstrate that alternative accommodations proposed by the employee constitute undue hardship, as long as the employer shows that it afforded the employee reasonable accommodation regardless of who suggested it. *Beadle v. Hillsborough County Sheriff's Dep't*, 29 F.3d at 592 (citing *Ansonia*, 479 U.S. at 68, 107 S.Ct. at 371–72); *Lee*, 22 F.3d at 1023 ("Title VII does not guarantee, however, that the employee will be given the accommodation of his choice," citing *Ansonia*). The employer's efforts to reach a reasonable accommodation trigger the employee's duty to cooperate. *Lee*, 22 F.3d at 1022 (citing *Toledo v. Nobel–Sysco, Inc.*, 892 F.2d 1481, 1486 (10th Cir. 1989), *cert. denied*, 495 U.S. 948, 110 S.Ct. 2208, 109 L.Ed.2d 535 (1990); *Brener v. Diagnostic Ctr. Hosp.*, 671 F.2d 141, 144 n. 2 (5th Cir.1982); *Chrysler Corp. v. Mann*, 561 F.2d 1282, 1286 (8th Cir.1977), *cert. denied*, 434 U.S. 1039, 98 S.Ct. 778, 54 L.Ed.2d 788 (1978)). The Fifth Circuit Court of Appeals found that an "employee has a correlative duty to make a good faith attempt to satisfy his needs through means offered by the employer." *Brener*, 671 F.2d at 146. In this circuit, the obligation has been described in terms of the negative consequences to the employee of failure to cooperate:

> [Where the employee] will not attempt to accommodate [the employee's] own beliefs through the means already available to him or cooperate with his employer in its conciliatory efforts, he may forego the right to have his beliefs accommodated.

*Chrysler Corp. v. Mann*, 561 F.2d at 1286. However, where the employer's efforts fail to eliminate the employee's religious conflict, the burden remains on the employer to establish that it is unable to reasonably accommodate the employee's beliefs without incurring undue hardship. *Cooper*, 15 F.3d at 1378. Thus, an employer does not fulfill its obligation to reasonably accommodate a religious belief when it is confronted with two religious objections and offers an accommodation which completely ignores one. *Id.* at 1379 (no reasonably accommodation where offer resolved one concern, missing church services, but not the "principal objection,"

which was to working on Saturday); *EEOC v. University of Detroit,* 904 F.2d 331, 334 (6th Cir.1990).

### 4. Accommodation in this case

Accommodation of Vetter's religious beliefs, which he believed required him to live in an active Jewish community, was obviously possible. Such a community, Ames, was less than one-hour's drive from his place of employment. Although this was Vetter's choice of an accommodation, and Farmland was not required to grant Vetter the accommodation of his choice, the question is whether such an accommodation was reasonable, *i.e.,* whether it imposed undue hardship on Farmland. A further question is whether Farmland offered an adequate accommodation to Vetter's beliefs by discovering that Fort Dodge had a synagogue and determining that Vetter could live there. The court finds that, at a minimum, there is a genuine issue of material fact on each of these questions precluding summary judgment.

#### a. Ames as a reasonable accommodation

First, the record raises no question that accommodating Vetter by allowing him to live in Ames would have compromised the contractual rights of other employees or impinged upon collective bargaining contract rights in any way. Thus, the *Hardison* objections are not present here. The court therefore turns to the question of whether the proposed accommodation involved more than de minimis costs to Farmland. Farmland has not represented that there would be "[a]ny cost in ... wage expenditures that is more than de minimis'" so as to constitute undue hardship in allowing Vetter to live in Ames. *Mann,* 7 F.3d at 1370. Were there any pecuniary cost to Farmland as the result of Vetter living in Ames, Vetter proposed to eliminate that cost as well by bearing the costs of his travel between his workplace and his home himself.

The question then becomes whether the proposed accommodation imposed "'[a]ny cost in efficiency.'" *Id.* Farmland asserts that it has an interest in LPSs living in the communities they serve to enhance business ties. The court has already noted the parties dispute over the genuineness of this interest at page 1297 of this ruling. The court concludes that there is a genuine issue of material fact on whether there would be any cost in efficiency to Farmland as the result of allowing Vetter to live in Ames, because more than one of Farmland's LPSs currently lives outside of his or her trade area.

Vetter has also generated a genuine issue of material fact as to the reasonableness of the accommodation of allowing him to live in Webster City while his family lives in Ames. This proposed accommodation would appear to eliminate most of Farmland's "costs" of accommodating Vetter's religious beliefs. The record as it stands at the moment is nearly devoid of "evidence of tangible present costs" resulting from either of Vetter's proposed accommodations which would allow either his family or himself and his family to live in Ames.

Nor does the court find on the present record that there is a risk that accommodating Vetter will run afoul of differential treatment prohibitions in Title VII. Farmland appears already to be offering exceptions to LPSs who live outside of their trade areas or at considerable distances from cooperatives they serve. Thus, an exception for Vetter will not confer a privilege, the cost of which is more than de minimis, solely on the basis of Vetter's religious beliefs, that offends Title VII's prohibitions on disparate treatment.

#### b. Fort Dodge as a reasonable accommodation

Farmland might argue that it does not have to consider the accommodation of allowing Vetter to live in Ames, because it has already offered a reasonable accommodation, in the form of living in Fort Dodge, which Vetter was obligated at least to consider, and that Vetter's rejection of that accommodation ended Farmland's obligation to provide other accommodation. However, there is at least a genuine issue of material fact that Fort Dodge was not an adequate accommodation.

First, Fort Dodge appears to offer only an accommodation to part of Vetter's religious interests. While Fort Dodge does have a synagogue, that synagogue is essentially "inactive," providing only occasional services,

and there does not appear to by an active Jewish community of the type Vetter asserts is necessary to sustenance of his faith. Where the employer's efforts fail to eliminate the employee's religious conflict, the burden remains on the employer to establish that it is unable to reasonably accommodate the employee's beliefs without incurring undue hardship. *Cooper,* 15 F.3d at 1378. Thus, an employer does not fulfill its obligation to reasonably accommodate a religious belief when it is confronted with two religious objections and offers an accommodation which completely ignores one. *Id.* at 1379 (no reasonably accommodation where offer resolved one concern, missing church services, but not the "principal objection," which was to working on Saturday); *EEOC v. University of Detroit,* 904 F.2d 331, 334 (6th Cir.1990). Here, there is at least a genuine issue of material fact as to whether the proffered accommodation of Fort Dodge addresses Vetter's "principal objection," which was to the lack of an active Jewish community. The court cannot find as a matter of law that Fort Dodge was a reasonable accommodation and that Vetter's failure to accept it terminated Farmland's obligation to accommodate Vetter's religion.

As with Vetter's disparate treatment claims, the court finds that genuine issues of material fact preclude summary judgment in favor of Farmland on Vetter's claims of failure to accommodate his religion. Farmland is not entitled to summary judgment, and this matter must proceed to trial for resolution of Vetter's claims.

## V. CONCLUSION

Vetter has established at least a genuine issue of material on each element of his *prima facie* case of disparate treatment because of religion and on the question of whether Farmland's proffered legitimate reason for his discharge is pretextual. The court concludes that the elements of a *prima facie* case of disparate treatment because of religion are as follows: (1) the plaintiff was a member of a protected class because of the plaintiff's religious affiliation or beliefs; (2) the employee informed the employer of his or her religious beliefs; (3) the plaintiff was

qualified for the position; (4) despite the plaintiff's qualifications, the plaintiff was fired or denied an employment benefit; and (5) similarly situated employees outside of the plaintiff's protected class were treated differently or there is other evidence giving rise to an inference of discrimination.

Examining these elements in this case, the court finds that there is no significant dispute that Vetter was a member of a protected class on the basis of his adherence to the Jewish faith, he informed his employer of his adherence to that faith, he was qualified for the position in which he was employed, and he was fired from that position. Vetter has generated a genuine issue of material fact as to the final element of his *prima facie* case, because, although he was hired and fired essentially by the same person, there is no presumption that the termination was not discriminatory, because it was only after he was hired that Farmland officials learned of his religious affiliation, and because of evidence of more favorable treatment of similarly situated LPSs who were not members of his faith.

On the question of whether Farmland's proffered legitimate reason for Vetter's discharge is pretextual, the court again finds genuine issues of material fact. The determinative question for the court, and the question upon which it finds a genuine issue of material fact, is not what reason was given, but whether Vetter had in fact refused to live within his trade area, or had only been unable to find housing within the territory and was attempting to explore alternatives. There is also a genuine issue of material fact on the related questions of whether living within the trade area was in fact a requirement of Vetter's position, what the precise terms of such a requirement were, and whether the requirement was communicated to Vetter prior to his hiring. Furthermore, there is a genuine issue of material fact as to whether or not other similarly situated LPSs who are not members of the Jewish faith were subjected to the requirement. Thus, Farmland's motion for summary judgment must be denied as to Vetter's disparate treatment claims.

Similarly, the court concludes that there are genuine issues of material fact precluding summary judgment in Farmland's favor on Vetter's claims of failure to provide reasonable accommodation to his religious beliefs. The *prima facie* showing in support of this claim requires Vetter to show that (1) he has a bona fide belief that compliance with an employment requirement is contrary to his religious faith; (2) he informed Farmland about the conflict; and (3) he was discharged because of the his refusal to comply with the employment requirement. There appears to be no dispute that Vetter informed Farmland of his religious beliefs and the way in which they conflicted with the requirement that he live within his trade area, nor is there any dispute that Vetter was terminated for not complying with that requirement.

As to the first element of this *prima facie* case, the court finds that it is appropriate to make a minimal inquiry as to whether there is a connection between the asserted belief or practice and the plaintiff's religion. The court concludes that a "sensible approach" would *require the plaintiff to come forward with only enough information to demonstrate a connection between the employee's practice and the employee's professed religion.* Vetter has come forward with such information in the form of the affidavit of Rabbi Stanley Herman pertaining to the importance of living in a Jewish community to one of that faith. Vetter's conduct also demonstrates the sincerity of his religious beliefs. Thus, Vetter has established, at least to the extent necessary to preclude summary judgment, that he was entitled to reasonable accommodation of his religious beliefs.

Turning to the question of accommodation, therefore, the court concludes that while there is at least a genuine issue of material fact that Ames presented a reasonable accommodation, the court cannot hold that Fort Dodge presented an adequate offer of accommodation the refusal of which precludes Vetter from seeking further accommodation. On the summary judgment record, Fort Dodge appears to be only a partial accommodation that did not address Vetter's principal concern, which was that he and his family live in an active Jewish community. As to allowing Vetter to live in Ames, or allowing his family to live in Ames while Vetter lives in Webster City, the court finds that Farmland failed to demonstrate that there would be more than a de minimis cost in pecuniary terms or in terms of efficiency. The court finds further that there is at least a genuine issue of material fact as to whether Vetter's proposals to bear any extra transportation costs of his living in Ames or to live in Webster City himself while his family lives in Ames eliminate any costs of the proposed accommodation. Farmland is not entitled to summary judgment on the claims of failure to accommodate either.

Farmland's motion for summary judgment is therefore denied in its entirety, and this matter will proceed to trial on the merits.

**IT IS SO ORDERED.**