# OPINIONS OF THE JUSTICES.

## OPINION OF THE JUSTICES TO THE HOUSE OF REPRESENTATIVES.

*Constitutional Law,* Commerce clause, Interstate commerce, Taxation. *Supreme Judicial Court,* Opinions of the Justices. *Statute,* Validity. *Motor Vehicle.* Lease agreement.

Discussion of the "dormant," or negative, commerce clause of the United States Constitution, as explicated in *Oklahoma Tax Comm'n* v. *Jefferson Lines, Inc.,* 514 U. S. 175, 179-183 (1995). [1203-1204]

The rental of automobiles in Boston is an aspect of interstate transportation and a surcharge imposed in Boston on such rentals has a sufficient effect on interstate commerce to require commerce clause scrutiny. [1204-1207]

A proposed differential surcharge on the rental of automobiles in Boston, of three dollars for Boston residents and ten dollars for all others, is facially discriminatory against nonresident businesses and is per se invalid under the dormant aspect of the commerce clause of the United States Constitution. [1207-1211]

On November 19, 1998, the Justices submitted the following response to questions propounded to them by the House of Representatives.

To the Honorable the House of Representatives of the Commonwealth of Massachusetts:

The undersigned Justices of the Supreme Judicial Court respectfully submit their response to the questions set forth in an order adopted by the House of Representatives on October 5, 1998, and transmitted to this court on October 8, 1998. The order recites that § 2 of House No. 5822, a bill pending before the General Court, entitled "An Act further regulating convention and exhibition centers in the commonwealth," reduces the ten dollar additional surcharge imposed on each vehicular rental transaction contract in the city of Boston to three dollars for residents of the city of Boston, and that grave doubt exists as to the constitutionality of the bill if enacted into law. The Act would strike out St. 1997, c. 152, § 9 (*e*), and replace it with the following language: "There shall be an additional surcharge of $10, or in the case of residents of the city of Boston $3, imposed upon each vehicular rental transaction contract in said

city; provided, however, that $1 of said additional surcharge shall be paid to said city and deposited in the Room Occupancy Excise Fund."

The order presents to us the following questions:

> "1. Would the enactment of Section 2 of said House No. 5822 in that it reduces the surcharge on vehicular rental transaction contracts in the city of Boston from ten dollars to three dollars for residents of the city of Boston violate the Privileges and Immunities Clause of the United States Constitution, Art. IV, Sec. 2, cl. 1?

> "2. Would the enactment of Section 2 of said House No. 5822 in that it reduces the surcharge on vehicular rental transaction contracts in the city of Boston from ten dollars to three dollars for residents of the city of Boston violate the Commerce Clause of the Constitution, Art. 1, Sec. 8?

> "3. Would the enactment of Section 2 of said House No. 5822 in that it reduces the surcharge on vehicular rental transaction contracts in the city of Boston from ten dollars to three dollars for residents of the city of Boston deny equal protection of the laws under the Fourteenth Amendment of the United States Constitution or the Declaration of Rights of the Massachusetts Constitution to nonresidents of the city of Boston?"

A memorandum of interested parties was submitted to the court by Bernard Borman, a Boston resident who "rents automobiles near his home," on behalf of himself and other similarly situated individuals.

The proposed measure plainly imposes a different burden on vehicle renters who are not residents of Boston (nonresidents) than on those who reside in the city (residents). Tax legislation invariably makes distinctions that impose different burdens on different classes of persons. Rent seeking, which seeks to shift some of the cost of widely shared benefits, is the stuff of politics. See DeBow, The Social Costs of Populist Antitrust: A Public Choice Perspective, 14 Harv. J.L. & Pub. Pol'y 205, 214 (1991) ("The public choice theory of rent seeking focuses on the processes by which government dispenses favorable treatment [for example, tax breaks, direct subsidies, or protection from competition] to private parties" and the efforts of individuals,

businesses and organizations to "gain access to a share of this largesse"). It is only where the allocation of burdens disproportionately disadvantages interests or groups enjoying some measure of constitutional solicitude that a measure raises constitutional concern. See, e.g., *Minneapolis Star & Tribune Co.* v. *Minnesota Comm'r of Revenue*, 460 U.S. 575 (1983). One such family of concerns relates to measures that disproportionately disadvantage persons or interests outside of the State imposing the measures. The constitutional provisions that address these concerns are the commerce clause, art. I, § 8, the privileges and immunities clause, art. IV, § 2, and the equal protection clause of the Fourteenth Amendment to the United States Constitution.

*Question 2: Commerce Clause.*

The second question propounded by the House of Representatives asks us to determine whether the enactment of § 2 of House No. 5822 would violate the commerce clause of the United States Constitution. We note at the outset that "[t]here is no presumption of validity when we consider a proposed statute in an advisory opinion." *Opinion of the Justices*, 368 Mass. 831, 842 (1975), quoting *Opinion of the Justices*, 345 Mass. 780, 781-782 (1963).

The Supreme Court of the United States continues to interpret the commerce clause as more than an authority for Congress to legislate in the premises. See, e.g., *Camps Newfound/Owatonna, Inc.* v. *Harrison*, 520 U.S. 564 (1997). The Court, in spite of persisting doubts and criticism, see *id.* at 610-611 (Thomas, J., dissenting); Redish, The Dormant Commerce Clause and the Constitutional Balance of Federalism, 1987 Duke L.J. 569; Kitch, Regulation, the American Common Market and Public Choice, 6 Harv. J.L. & Pub. Pol'y 119 (1982), interprets the clause as imposing limits on the authority of State and local governments to regulate in ways that impinge on interstate or foreign commerce. See, e.g., *Oklahoma Tax Comm'n* v. *Jefferson Lines, Inc.*, 514 U.S. 175, 179 (1995); *West Lynn Creamery* v. *Healy*, 512 U.S. 186, 192-193 (1994), quoting *New Energy Co. of Ind.* v. *Limbach*, 486 U.S. 269, 273-274 (1988); *Cooley* v. *Wardens of the Port of Philadelphia*, 53 U.S. (12 How.) 299 (1851).

The course of decision under what has come to be known as the dormant, or negative, commerce clause, see *Jefferson Lines,*

*Inc., supra,* has not been consistent, nor have lines of demarcation always been easy to discern, see *id.* at 179 (recounting the numerous "turns" the Supreme Court's "understanding of the dormant Commerce Clause has taken"), but "opinions of the Court through the years have reflected an alertness to the evils of 'economic isolation' and protectionism." *Philadelphia* v. *New Jersey,* 437 U.S. 617, 623 (1978). Therefore, a State may not "block the flow of natural resources or products of trade from one State to another in order to satisfy local needs," *Andover Sav. Bank* v. *Commissioner of Revenue,* 387 Mass. 229, 247 (1982), citing *New England Power Co.* v. *New Hampshire,* 455 U.S. 331 (1982); *Hughes* v. *Oklahoma,* 441 U.S. 322 (1979), and is prevented from "retreating into economic isolation or jeopardizing the welfare of the Nation as a whole, as it would do if it were free to place burdens on the flow of commerce across its borders that commerce wholly within those borders would not bear." *Jefferson Lines, Inc., supra* at 180. See *H.P. Hood & Sons* v. *DaMond,* 336 U.S. 525, 532 (1949); *Baldwin* v. *G.A.F. Seelig, Inc.,* 294 U.S. 511, 527 (1935) ("What is ultimate is the principle that one state in its dealings with another may not place itself in a position of economic isolation. . . . Neither the power to tax nor the police power may be used by the state of destination with the aim and effect of establishing an economic barrier against competition with the products of another state or the labor of its residents").

It has also been noted that legislation disadvantaging out-of-State interests, which by hypothesis cannot participate in the political process imposing that disadvantage, has for that reason a special burden of justification. See 2 R.D. Rotunda & J.E. Nowak, Constitutional Law: Substance and Procedure § 11.11(a) (2d ed. 1992); Farber, In the Shadow of the Legislature: The Common Law in the Age of the New Public Law, 89 Mich. L. Rev. 875, 906 n.74 (1991); Sunstein, Naked Preferences and the Constitution, 84 Colum. L. Rev. 1689, 1705 (1984); Tushnet, Rethinking the Dormant Commerce Clause, 1979 Wis. L. Rev. 125. Cf. *McCulloch* v. *Maryland,* 17 U.S. (4 Wheat.) 316, 428-429 (1819). But see *West Lynn Creamery, Inc., supra* at 212-217 (Rehnquist, C.J., dissenting).

In assessing whether a particular statutory provision violates the dormant commerce clause, an initial question is whether that provision "has a sufficient effect on interstate commerce to evoke commerce clause scrutiny." *Perini Corp.* v. *Commis-*

*sioner of Revenue*, 419 Mass. 763, 766 (1995), citing *Aronson v. Commonwealth*, 401 Mass. 244, 248 (1987), cert. denied, 488 U.S. 818 (1988). Inhibitions on interstate transportation affect interstate commerce. Indeed, they are the very kind of regulations that the Supreme Court has ruled are impermissible under the commerce clause. See *Camps Newfound/Owatonna, Inc.*, *supra* at 573 ("transportation of persons across state lines . . . has long been recognized as a form of 'commerce' "); *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1 (1824). The rental of vehicles in Boston is plainly an aspect of interstate transportation. Many, if not the majority, of those who rent motor vehicles in the city of Boston are interstate travelers, and their vehicle rentals may represent the final step of an interstate journey. It does not matter that some vehicles rented in Boston might be driven only within the city. "The Court has . . . long since rejected any suggestion that a state tax or regulation affecting interstate commerce is immune from Commerce Clause scrutiny because it attaches only to a 'local' . . . activity." *Commonwealth Edison Co.* v. *Montana*, 453 U.S. 609, 615 (1981). See *Camps Newfound/Owatonna, Inc.*, *supra* at 572-574, citing *Heart of Atlanta Motel, Inc.* v. *United States*, 379 U.S. 241, 258 (1964). Moreover, interstate travelers affect interstate commerce regardless of whether they travel as tourists or for business purposes. See, e.g., *Heart of Atlanta Motel, Inc.*, *supra.* As we noted in *Aronson*, *supra*, "[a]ll objects of interstate trade merit Commerce Clause protection; none is excluded by definition at the outset." *Id.* at 248, quoting *Philadelphia* v. *New Jersey*, 437 U.S. 617, 622 (1978). Tourism is a "product of trade," and is considered by the Massachusetts and Federal governments to be an export for economic purposes. See Massachusetts Department of Economic Development, Strategic Plan (1998) (listing "out-of-state visitor expenditures" as one measure of success of export promotion efforts); Doggett, United States Department of Commerce, Tourism's Role in a Changing Economy (1998) ("international travel to the United States is an export"); Bureau of the Census, United States Department of Commerce, Statistical Abstract of the United States 788 (117th ed. 1997) (listing travel and passenger fares as exports in statistical data regarding "U.S. International Transactions"). Cf. *Camps Newfound/Owatonna, Inc.*, *supra* at 577 n.10 (noting the "applicability of our dormant Commerce Clause jurisprudence to service industries"). In fact, the Massachusetts Department of Economic

Development lists "Tourism and Cultural Facilities," specifically including a "new professional stadium and/or convention center," as one of the key infrastructural improvements that will spur economic growth in the Commonwealth. Strategic Plan, *supra*. Finally, to the extent that vehicles are rented for commercial use, the proposed measure discriminates against out-of-State businesses, not just against individuals, and, in such cases, even more obviously affects interstate commerce. For these reasons, the surcharge in question here has a "sufficient effect on interstate commerce," *Perini Corp.*, *supra* at 766, to require further commerce clause inquiry.

This surcharge is different from the typical measure challenged under the dormant commerce clause in that it discriminates against individual nonresident consumers, not necessarily against nonresident businesses that compete with local companies. As such, it might seem conceptually different from the majority of protectionist measures struck down under the dormant commerce clause. But the fact that the surcharge in question would discriminate against nonresident customers of vehicle rental agencies, as opposed to foreign vehicle rental companies, does not exempt the statute from the restrictions of the dormant commerce clause. Without question, many of those nonresidents who rent vehicles in Boston are on business travel, or are renting for other commercial purposes, and are placed at a disadvantage, in comparison with resident businesses, by the higher surcharge. Moreover, although the Supreme Court's dormant commerce clause jurisprudence most often has been applied to measures that discriminate against out-of-State businesses, see, e.g., *West Lynn Creamery, Inc.* v. *Healy*, 512 U.S. 186 (1994), measures discriminating against out-of-State consumers have similarly not been tolerated. The Supreme Court has explicitly stated that "[e]conomic protectionism is not limited to attempts to convey advantages on local merchants; it may include attempts to give local consumers an advantage over consumers in other States." *Camps Newfound/Owatonna, Inc.*, *supra* at 577-578, quoting *Brown-Forman Distillers Corp.* v. *New York State Liquor Auth.*, 476 U.S. 573, 580 (1986). See *Maryland* v. *Louisiana*, 451 U.S. 725, 756-760 (1981) (applying dormant commerce clause to State statute favoring in-State gas consumers and discriminating against purchasers of gas moving in interstate commerce); *Pennsylvania* v. *West Virginia*, 262 U.S. 553, 598 (1923) (dormant commerce clause prohibits State

from regulating "interstate business to the advantage of the local consumers").

That a measure enacted by a city or other locality discriminates against both out-of-State interests and in-State interests outside that locality does not deflect analysis under the dormant commerce clause.[1] See *Dean Milk Co.* v. *Madison*, 340 U.S. 349, 354 n.4 (1951) (it is "immaterial" that a city ordinance barring the sale of milk not processed within five miles of the city discriminates equally against in-State milk processed outside the five-mile perimeter); *C & A Carbone, Inc.* v. *Clarkstown*, 511 U.S. 383, 391 (1994); *Fort Gratiot Sanitary Landfill, Inc.* v. *Michigan Dep't of Natural Resources*, 504 U.S. 353, 361-363 (1992).

Once a sufficient nexus to interstate commerce has been found, the first step in applying dormant commerce clause analysis is deciding "whether the law . . . discriminates against interstate commerce." *Perini Corp., supra* at 767. See *Fulton Corp.* v. *Faulkner*, 516 U.S. 325, 331 (1996).[2]

Facially discriminatory statutes encounter a "virtually per se rule of invalidity." *Oregon Waste Sys., Inc.* v. *Department of Envtl. Quality of Or.*, 511 U.S. 93, 100 (1994). Such statutes are "routinely struck down . . . unless the discrimination is demonstrably justified by a valid factor unrelated to economic protectionism." *New Energy Co. of Ind.* v. *Limbach*, 486 U.S. 269, 274 (1988) (citations omitted). See *C & A Carbone, Inc., supra* at 392. The proposed measure, which would levy a surcharge of three dollars on vehicle rentals in Boston by Boston

---

[1]It should be noted, however, that the rent-seeking arguments supporting the dormant commerce clause jurisprudence are less forceful with respect to a statute discriminating against both out-of-State consumers and in-State consumers residing outside a particular municipality. Whereas out-of-State consumers have no electoral voice within the State and thus have little opportunity to protest the economic discrimination imposed upon them by a State law, State residents suffering the same discrimination do have an electoral voice and presumably will take advantage of it. But see Note, Functional Analysis, Subsidies, and the Dormant Commerce Clause, 110 Harv. L. Rev. 1537, 1554 n.56 (1997) (noting that, practically speaking, consumers have little influence due to collective action problems).

[2]The Supreme Court has had greater difficulty in applying dormant commerce clause doctrine where the legislation is neutral on its face but is claimed to have a discriminatory effect. Compare *Hunt* v. *Washington State Apple Advertising Comm'n*, 432 U.S. 333 (1977), with *Exxon* v. *Maryland*, 437 U.S. 117 (1978).

residents, and a ten-dollar surcharge on rentals in Boston by all other persons, is such a facially discriminatory measure. And even if it could be shown that the surcharge were not motivated by the "economic protectionism" that typifies statutes invalidated under the clause, the statute would not be excused from the scrutiny to which discriminatory measures are subjected, because "[t]he purpose of, or justification for, a law has no bearing on whether it is facially discriminatory." *Perini Corp., supra* at 767. See *Associated Indus. of Mo.* v. *Lohman,* 511 U.S. 641, 653 (1994); 3 C.J. Antieau & W.J. Rich, Modern Constitutional Law § 43.23, at 52 (2d ed. 1997) ("[E]ven when the goals of the state are not necessarily protectionist, if discrimination against interstate commerce is the method chosen to achieve the goal the state will have to overcome a strong presumption of unconstitutionality").

It has been argued that reducing the surcharge, which is currently assessed at ten dollars regardless of residency, to three dollars for Boston residents, would not burden nonresident businesses any more than the ten-dollar surcharge already does, and, thus, that the statute does not actively discriminate against interstate commerce. The fact remains, however, that to the extent that nonresident businesses are taxed at a higher rate than are businesses located in Boston, the nonresident businesses are put at a competitive disadvantage in that the increased costs must either be passed on to the customer or absorbed by the company. As this court recently noted in *Aloha Freightways, Inc.* v. *Commissioner of Revenue, ante* 418, 422 (1998), the dormant commerce clause "prevents States from aiding local business in competition with foreign businesses." Thus, that the statute would reduce for residents a tax currently assessed to everyone, rather than impose a new tax on nonresidents, does not render the statute nondiscriminatory for commerce clause purposes. Cf. *Westinghouse Elec. Corp.* v. *Tully,* 466 U.S. 388, 404 (1984) (in finding State tax statute violative of dormant commerce clause, Court stated it was irrelevant that the discrimination was carried out through denial of tax credit rather than imposition of higher tax).

In imposing a differential tax burden on out-of-State interests, the surcharge at issue resembles two facially discriminatory measures that have been struck down by the Supreme Court. In *Bacchus Imports, Ltd.* v. *Diaz,* 468 U.S. 263 (1984), the Court

invalidated a Hawaii law exempting from the State's liquor tax a concoction distilled from a plant that grows only in that State. A seventy per cent tax reduction, similar to what Boston residents would receive under the statute in question, would surely have fared no better than the complete exemption. And in *Camps Newfound/Owatonna, Inc.*, *supra* at 568, the Court struck down a facially invalid State statute exempting from property taxes "benevolent and charitable institutions" but denying that exemption to any such institution "conducted or operated principally for the benefit of" nonresidents of the State.

Statutes that are found to be facially discriminatory are "typically struck down without further inquiry." *Chemical Waste Mgmt., Inc.* v. *Hunt*, 504 U.S. 334, 342 (1992). In a rare case, however, such a statute might survive the "strictest scrutiny" to which it is subjected, *Perini Corp.*, *supra* at 771, if it has a "legitimate local purpose," *id.*; *Oregon Waste Sys., Inc.*, *supra* at 100; *Lewis* v. *BT Inv. Managers, Inc.*, 447 U.S. 27, 36 (1980); *Chemical Waste Mgmt., Inc.*, *supra* at 344, that cannot be "adequately served by reasonable nondiscriminatory alternatives," *Oregon Waste Sys., Inc.*, *supra* at 101, and if it is narrowly tailored to serve that purpose. See *Chemical Waste Mgmt., Inc.*, *supra* at 342-343, quoting *Hughes* v. *Oklahoma*, 441 U.S. 322, 337 (1979); *Dean Milk Co.*, *supra* at 354; *Perini Corp.*, *supra*.

The surcharge at issue here has no such purpose that can save it from the rule of virtually per se invalidity applicable to facially discriminatory measures. That the surcharge is intended to help fund a proposed convention center in the city is not an interest so compelling as to survive the "strictest scrutiny." See, e.g., *C & A Carbone, Inc.*, *supra* at 393 ("revenue generation [alone] is not a local interest that can justify discrimination against interstate commerce"). Moreover, even if the Commonwealth's interest in funding the convention center may be characterized as a "legitimate local purpose," it is by no means clear that there are no "reasonable nondiscriminatory alternatives" to further that purpose. The same analysis disposes of the argument, presented in the memorandum of interested parties, that reducing the cost to Boston residents of renting motor vehicles encourages residents to forgo permanent ownership of motor vehicles, thereby reducing urban plagues such as traffic

congestion and air pollution. Whether or not the reduction of these nuisances is a compelling government interest, and regardless of whether this interest is served in any way by the statute in question, it is unquestionable that there are other means of pursuing that purpose without discriminating on the basis of residency. See, e.g., *Chemical Waste Mgmt., Inc., supra* at 344-346.

Nor can the surcharge in question be justified as a compensatory tax. In certain circumstances, a tax facially discriminating against interstate commerce may be upheld as a compensatory, or off-setting, tax if another equivalent tax is assessed on interstate commerce. Compensatory taxes, however, are permissible only when the tax on in-State activity and the off-setting tax on interstate activity are taxes on "substantially equivalent event[s]." *Associated Indus. of Mo., supra* at 647. See *Oregon Waste Sys., Inc., supra* at 103; *Armco Inc.* v. *Hardesty,* 467 U.S. 638, 643 (1984); *Maryland* v. *Louisiana, supra* at 759; *Boston Stock Exch.* v. *State Tax Comm'n,* 429 U.S. 318, 330-332 (1977); 3 C.J. Antieau & W.J. Rich, *supra* at § 43.38.[3] The taxes must be "sufficiently similar in substance to serve as mutually exclusive 'proxies' for each other." *Oregon Waste Sys., Inc., supra* at 103, quoting *Armco Inc., supra* at 643.[4]

Only in the very rare case has the Supreme Court found taxes to be sufficiently similar to pass the substantial equivalence test. Even where two taxes are similar in the amount actually assessed, if they are significantly different in other respects, they will not be deemed substantially equivalent. Especially where two assessments tax different parties and different transactions, the Court has been unwilling to consider them so similar in substance as to be valid compensatory taxes. "[T]he general difficulty of comparing the economic incidence of state taxes

---

[3]A direct correspondence between the discriminatory tax and the tax allegedly offsetting it must be shown. The Supreme Court has "never suggested . . . that patent discrimination in part of the operation of a tax scheme . . . can be rendered inconsequential for Commerce Clause purposes by advantages given to interstate commerce in other facets of a tax plan or in other regions of a State." *Associated Indus. of Mo.* v. *Lohman,* 511 U.S. 641, 649 (1994).

[4]To justify a facially discriminatory tax, a State must, "as a threshold matter, 'identify . . . the intrastate tax burden for which the State is attempting to compensate.' " *Lohman, supra* at 648. See *Fulton Corp.* v. *Faulkner,* 516 U.S. 325, 332, 334 (1996). And the intrastate tax "must serve some purpose for which the State may otherwise impose a burden on interstate commerce." *Id.*

paid by different taxpayers upon different transactions goes a long way toward explaining why we have so seldom recognized a valid compensatory tax." *Fulton Corp., supra* at 342. It was argued in the memorandum of interested parties that the variation in the surcharge is justified by the fact that residents contribute to the construction of the convention center through payment of real estate and other taxes, whereas nonresidents do not. Taxes on real estate and income, however, can hardly be considered taxes of events "substantially equivalent" to the rental of motor vehicles.[5] Rather, the surcharge in question fits neatly within the class of taxes the Court is unwilling to consider compensatory because it taxes different persons and different activities than do real estate and income taxes. Real estate taxes, for example, are assessed only on those owning real estate, a group by no means coextensive with the group of resident motor vehicle renters given a tax break by the diminished surcharge.[6] Thus, the facially discriminatory surcharge here is not saved from invalidity as a compensatory tax.

For the reasons discussed above, the surcharge proposed by § 2 of House Bill No. 5822, which on its face discriminates against interstate commerce, contravenes the dormant aspect of the commerce clause of the United States Constitution, and is invalid.

Because we answer Question 2 in the affirmative, it is unnecessary for us to consider Questions 1 and 3, which ask us to consider whether the bill would violate the privileges and immunities clause of the United States Constitution or the equal protection of the laws under the United States Constitution or the Massachusetts Declaration of Rights.

The foregoing answer and opinion are submitted by the Chief Justice and the Associate Justices subscribing hereto on the 19th

---

[5]Because the surcharge fails to meet the substantial equivalence test, we need not reach the further question considered in compensatory tax cases, whether "the tax on interstate commerce [may] be shown roughly to approximate — but not exceed — the amount of the [corresponding] tax on intrastate commerce." *Fulton Corp., supra* at 332-333, quoting *Oregon Waste Sys., Inc.* v. *Department of Envtl. Quality of Or.*, 511 U.S. 93, 103 (1994).

[6]Moreover, the Supreme Court has been especially reluctant to treat "general revenue measures as relevant intrastate burdens for purposes of the compensatory tax doctrine." *Fulton Corp., supra* at 335. See *Oregon Waste, supra* at 104.

day of November, 1998.

HERBERT P. WILKINS

RUTH I. ABRAMS

NEIL L. LYNCH

JOHN M. GREANEY

CHARLES FRIED

MARGARET H. MARSHALL

RODERICK L. IRELAND