Kimberly M. CLOUTIER, Plaintiff

v.

COSTCO WHOLESALE, Defendant

No. CIV.A. 02–30138–MAP.

United States District Court,
D. Massachusetts.

March 30, 2004.

Lynn A. Kappelman, Seyfarth Shaw, Boston, for Costco Wholesale, Defendant.

Krista G. Pratt, Seyfarth Shaw, Boston, for Costco Wholesale, Defendant.

Michael O. Shea, Law Office of Michael O. Shea, Springfield, for Kimberly M. Cloutier, Plaintiff, Pro se.

*MEMORANDUM AND ORDER RE- GARDING DEFENDANT'S MO- TION FOR SUMMARY JUDG- MENT AND PLAINTIFF'S MO- TION TO CERTIFY A QUESTION OF LAW* (Docket Nos. 35 & 39)

PONSOR, District Judge.

## I. *INTRODUCTION*

Plaintiff Kimberly Cloutier is a member of the Church of Body Modification, a national organization of some thousand members that emphasizes, as part of its religious doctrine, spiritual growth through body modification.[1] Defendant Costco, plaintiff's former employer, terminated Cloutier after she violated Costco's dress code by insisting on wearing facial piercings while working as a cashier and by refusing an accommodation (originally suggested by Cloutier herself) that would have allowed her to continue wearing her piercings in a less noticeable manner.

Cloutier has sued Costco, claiming that her termination violated her rights under Title VII, 42 U.S.C. § 2000e–2(a), and under chapter 151B, § 4(1A) of the Massachusetts General Laws. Costco has moved for summary judgment claiming that the facts of this case, even viewed in the light most favorable to the plaintiff, will not support a claim under either statute.[2]

For the reasons set forth below, the defendant's motion will be allowed. Before summarizing the court's reasoning, however, it is important to emphasize one point. This decision is not intended in any way to offer an opinion on the substance or validity of the belief system of the Church of Body Modification. While its tenets may be viewed by some as unconventional, or even bizarre, the respect afforded by our laws to individual conscience, particularly in regard to religious beliefs, puts any deconstruction of the Church's doctrine beyond the purview of the court. Indeed, as the Supreme Court has noted, "[Individuals] may believe what they cannot prove. They may not be put to the proof of their religious doctrines or beliefs." *United States v. Ballard,* 322 U.S. 78, 86, 64 S.Ct. 882, 88 L.Ed. 1148 (1944).

As will be seen, even if the belief system of the Church of Body Modification is accepted on its own terms, the undisputed facts of record demonstrate that the accommodation offered by Costco, and ultimately rejected by the plaintiff, was reasonable as a matter of law. Given this, the controlling authorities require entry of judgment in favor of the defendant.[3]

## II. *STANDARD OF REVIEW*

Summary judgment is proper where the moving party, here the defendant, has demonstrated that there are no material facts in dispute and that, therefore, it is entitled to a judgment as a matter of law.

---

**1.** Docket No. 41, App. I & J.

**2.** Earlier, the court allowed defendant's motion to dismiss as to plaintiff's third count, a claim under Mass. Gen. Laws chapter 12, § 111. Docket No. 8.

**3.** As discussion below will reveal, the evidence of record also substantially supports an alternate ground for summary judgment: that plaintiff's position regarding her piercings reflected not sincerely held "religious" belief, but merely strong personal preference. Because entry of summary judgment is mandated based on defendant's offer of a reasonable accommodation, however, it is not necessary to base the court's ruling on this more uncertain legal foundation.

*Dasey v. Anderson,* 304 F.3d 148, 153 (1st Cir.2002). The defendant bears the burden of demonstrating to the court that the evidence does not support the nonmoving party's case. *Sands v. Ridefilm Corp.,* 212 F.3d 657, 661 (1st Cir.2000). "After such a showing, the 'burden shifts to the nonmoving party, with respect to each issue on which he has the burden of proof, to demonstrate that a trier of fact reasonably could find in his favor.'" *Id.* (citation omitted). In performing this analysis, the court must examine the facts in the light most favorable to the nonmoving party and draw all reasonable inferences in her favor. *Id.* If there is sufficient evidence favoring the nonmoving party for a trier of fact to return a verdict for that party, the court must deny the motion for summary judgment.

### III. *FACTUAL BACKGROUND*

Viewing the case in the light most favorable to the plaintiff, a jury might find the following facts.

In July of 1997, Costco hired Cloutier as a front end assistant for its West Springfield, Massachusetts store. At the time, Cloutier had eleven ear piercings, but no facial piercings. Cloutier also had four tattoos on her upper arms, though these were concealed under the clothing she wore during her interview and for the duration of her employment with Costco. Cloutier did not notify Costco during her interview or upon beginning her employment of her religious beliefs or practices. Shortly before her first day of work, Cloutier received her first copy of the Costco Wholesale Handbook, also referred to as the employment agreement, containing the employee dress code.

In September 1997, two months after hiring her, Costco moved Cloutier to the deli department, where part of her responsibilities included handling food. In 1998, during Cloutier's time in the deli department, Costco revised its dress code policy and the provisions of its employment agreement to prohibit food handlers from wearing jewelry. Cloutier's supervisor at the deli, Laura Ostrander, told Cloutier that she would have to comply with the company's policy and remove her earrings and other jewelry. Cloutier replied that she would not take them out. She neither mentioned her membership in any church or any personal religious beliefs, nor requested an accommodation for her jewelry wearing. However, because she did not want to remove her earrings, Cloutier sought a transfer out of the deli department. Costco accommodated this request for transfer.

In June of 1998, Cloutier returned to the position of front end assistant. Around this time, Cloutier got her eyebrow pierced. She has not removed her eyebrow ring since. Cloutier continued working as a front end assistant until July 2000, when she was promoted to cashier. Throughout this two-year period, Cloutier engaged in the practices of tattooing, piercing, cutting, and scarification,[4] though not as part of any sectarian religious practice or belief. Nonetheless, Cloutier testified in her deposition that she engaged in these practices because they had meaning to her.

At some point in January of 2001, Cloutier learned of the Church of Body Modification ("CBM") from friends and acquaintances. The CBM is a congregation whose goal is to "achieve acceptance in this given society so that [members of the Church] may celebrate [their] bodies with body modification." Docket. No. 37, App. D.

---

4. Scarification involves wounding oneself and removing the scabs so as to leave a more

prominent scar. Docket 41, App. C.

According to the mission statement on the CBM website, members of the CBM believe that the practice of body modification and body manipulation strengthens the bond between mind, body, and soul, thus ensuring that adherents live as spiritually complete and healthy individuals. *See* www.uscobm.com. Among the practices of members of the CBM are body modifications such as piercing, tattooing, branding, transdermal[5] or subcutaneous[6] implants, and body manipulation, such as flesh hook suspensions and pulling. At one time, the CBM listed as one of its tenets that members should "seek to be confident models in learning, teaching and displaying body modification."[7] Docket No. 37, App. D. Although it does not appear that CBM doctrine demands the practice, Cloutier has personally interpreted this tenet as requiring her to display her body modifications at all times.

After reviewing the CBM's website, Cloutier decided to join. Costco disputes the timing of Cloutier's membership in the CBM. It obtained from the CBM a copy of Cloutier's application form, which is dated June 27, 2001. However, during her deposition, Cloutier testified that she actually joined the CBM three months earlier, in March 2001. She stated that she attempted to submit her membership application on-line, but due to a computer glitch the application was not processed. Cloutier further testified that she had a number of phone conversations with someone from the CBM about the status of her application. Eventually, after Cloutier resubmit-

ted her application in June 2001, her membership was formally processed, and she received her membership card that July.

In March of 2001, Costco again revised its employment agreement, and on March 27, 2001, Cloutier received a copy of Costco's new dress code policy, which forbade the wearing of any facial jewelry.[8] Cloutier testified at her deposition that she first became aware of the new dress code policy shortly after receiving a copy in March of 2001. She did not, however, request a religious accommodation for the wearing of her facial jewelry at that time but simply continued to wear her facial jewelry despite the dress code policy. Costco did not begin to enforce the facial jewelry policy until June.

On June 25, 2001, Cloutier and her co-worker, Jennifer Theriaque reported to work wearing their eyebrow rings. Two supervisors, Todd Cunningham and Michele Callaghan, called Cloutier and Theriaque into an office and advised them that their facial piercings would have to be removed in order for the two women to continue to work for Costco. Cloutier did not say anything to her supervisors about her religion at that time. Theriaque, on the other hand, informed Cunningham and Callaghan of her own membership in the CBM, as well as Cloutier's. Both Theriaque and Cloutier returned to work after this discussion.

The following day, June 26, 2001, Cloutier and Theriaque returned to work still

---

**5.** An transdermal implant is a piece of metal that goes underneath the skin and comes through the skin. Docket No. 41, App. J.

**6.** A subcutaneous implant is stainless steel inserted under the skin. Docket No. 41, App. J.

**7.** This tenet was listed in the CBM materials that Cloutier provided to Costco in June of 2001.

**8.** The new policy stated that "[a]ppearance and perception play a key role in member service. Our goal is to be dressed in professional attire that is appropriate to our business at all times.... No visible facial or tongue jewelry (earrings permitted)." Docket No. 37, App. B.

wearing their facial jewelry. Again, Callaghan notified the women of the dress code policy against facial jewelry. This time, Cloutier herself presented Callaghan with information about the CBM from its website. Both Cloutier and Theriaque claimed that wearing their facial jewelry constituted a practice required by their religion. After reviewing the material, Callaghan consulted with her supervisor, Andy Mulik. Mulik ordered Cloutier and Theriaque to remove the jewelry or leave work. Both Cloutier and Theriaque went home. Cloutier filed a complaint with the EEOC the following day.

On June 29, 2001, her next scheduled shift, Cloutier went to work wearing her facial jewelry. She was again ordered to remove her jewelry or leave work. This time, Cloutier met with the store manager, Mark Schevchuck, about her EEOC complaint and once more produced the CBM documents about her religion. In addition, Cloutier offered to wear a band-aid over her jewelry instead of removing it. Schevchuck replied that this was not acceptable. Cloutier went back home.

Theriaque also returned to work on June 29, 2001, wearing her facial jewelry. When approached by her supervisors, Theriaque inquired about wearing a retainer in place of her jewelry. The retainer, an unobtrusive clear plastic spacer, would prevent Theriaque's piercing from healing and closing, and at the same time would be far less noticeable than her usual facial jewelry.

Cloutier and Costco dispute what occurred next. It is Costco's position that it immediately accepted this compromise, and Theriaque was permitted to return to work with a retainer in the place of jewelry in her eyebrow. It is Cloutier's position that Theriaque returned to work without her eyebrow jewelry but, somehow, kept hidden the fact that she was wearing a retainer or fishing wire in place of the jewelry. Cloutier believes that Theriaque's subterfuge continued for three or four weeks until Costco capitulated and allowed Theriaque to wear a retainer.

Somewhat inconsistently, Cloutier also testified that sometime during the week of July 2, 2001, she learned of Theriaque and Costco's resolution of the piercing controversy. In other words, it is undisputed that Cloutier was aware within about one week of the genesis of the dispute that she could, in fact, return to work if she wore a retainer instead of her facial jewelry.

Nevertheless, Cloutier did not report for any of her scheduled shifts after July 1, 2001. Cloutier testified at her deposition that Schevchuck told her not to return to work until he found out how Costco was going to respond to her EEOC complaint. Accordingly, she waited at home for a phone call from Schevchuck, all the while under the impression that her absences from work would not count against her attendance record.

On July 14, 2001, Cloutier received her termination notice. Costco took the position that the CBM was not a religion as the term is defined in state and federal anti-discrimination laws. Moreover, even if the CBM were a religion, Costco did not believe that CBM doctrine required Cloutier to wear her facial jewelry *at all times*. Consequently, in Costco's view, Cloutier's absences from work due to violations of the dress code were unexcused absences. Since its employment agreement authorized termination after three or more unexcused absences, Costco fired Cloutier. As noted, Cloutier contends that she was told to wait at home for a call to inform her of Costco's decision—a call she never received. Her first notice of Costco's final position on her religious practice, she says, was the termination notice.

Approximately three weeks later, on August 10, 2001, during the EEOC negotia-

tion between Costco and Cloutier, Costco presented Cloutier with an unconditional offer to return to work if she complied with the dress code and wore either a band-aid over her facial jewelry or a retainer in place of the jewelry. This offer was memorialized and reiterated in an August 29, 2001 letter from Costco to Cloutier. Notably, this band-aid accommodation was the same compromise that Cloutier had herself suggested in June. The August 29th letter requested that Cloutier respond to Schevchuck by September 6, 2001. Costco contends that Cloutier never responded to its offer to accommodate. Cloutier testified that she placed a call to Schevchuck on September 6, 2001, but he was not available. Cloutier maintains that he never returned her phone call, and she never tried to reach him again.

In any event, Cloutier now argues that wearing a band-aid over her facial piercing, or replacing her jewelry during working hours with a clear plastic retainer, would violate her personal religious convictions. Cloutier avers that it is her sincere belief that her religion, the CBM, requires that she *display* her facial jewelry at *all* times. Short of excusing her from the dress code policy entirely, Cloutier does not believe there is any accommodation that Costco could offer that would satisfy the tenets of her religion. Costco asserts that allowing Cloutier to be exempted from its neutral dress code policy would be an undue hardship on its business in that an exemption would undermine Costco's interest in presenting a professional appearance to its customers.

## IV. DISCUSSION

Plaintiff brings both a federal claim and a state claim for religious discrimination. Because the analysis under Title VII and chapter 151B differs somewhat, the court will discuss each statute separately below.

### A. *Title VII Claim*

Title VII of the Civil Rights act of 1964, as amended in 1972, prohibits employers from discriminating against an employee based on that employee's religion. 42 U.S.C. § 2000e–2(a). The term "religion," as used within the provisions of Title VII, encompasses "all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's ... religious observance or practice without undue hardship on the conduct of the employer's business." *Id.* § 2000e(j). Thus, where an employee's bona fide religious belief or practice conflicts with an employment requirement, Title VII requires the employer "to accommodate [the belief or practice], within reasonable limits." *E.E.O.C. v. Union Independiente De La Autoridad De Acueductos Y Alcantarillados De P.R.,* 279 F.3d 49, 55 (1st Cir.2002).

The First Circuit applies a two-part framework, developed in other Title VII contexts, to analyze a Title VII claim for religious discrimination. *Union Independiente,* 279 F.3d at 55. First, the plaintiff must "establish a *prima facie* case of religious discrimination based on a failure to accommodate." [9] *Union Independiente,*

---

**9.** In addition to asserting a religious discrimination claim based on failure to accommodate, plaintiffs may also proceed under a disparate treatment theory—alleging, for example, that the practices of one religion are being accommodated but not the practices of another. *See Peterson v. Hewlett Packard Co.,* 358 F.3d 599, 603 (9th Cir.2004); *Chalmers v. Tulon Co. of Richmond,* 101 F.3d

1012, 1017 (4th Cir.1996). No such alternate theory has been offered here. In her memorandum, plaintiff does characterize her termination as an act of "retaliation" against her based on her religious belief, but this claim has not been pled separately and, in the context of this case, would fall within the recognized "failure to accommodate" analysis in any event.

279 F.3d at 55. The plaintiff must show that "(1) a bona fide religious practice conflicts with an employment requirement, (2) he or she brought the practice to the [employer's] attention, and (3) the religious practice was the basis for the adverse employment decision." *Id.* (internal quotations and citations omitted). Second, if the plaintiff establishes a *prima facie* case, then the burden shifts to the employer "to show that it made a reasonable accommodation of the religious practice or show that any accommodation would result in undue hardship." *Id.*

The first element of the plaintiff's *prima facie* case requires a demonstration that the plaintiff's belief or practice is religious *and* that it is sincerely held. *Id.* at 56. At the summary judgment stage, the defendant will ordinarily face a difficult task in challenging the contention that the plaintiff's belief is religious, no matter how unconventional the asserted religious belief may be. The First Circuit has stated that Title VII "leaves little room for a party to challenge the religious nature of an employee's professed beliefs." *Id.*

The difficulty for an employer on this point derives not only from the elusiveness of the term "religious" but also from the fact that the employee's religious beliefs need not be espoused by a formal religion or conventionally organized church. As the EEOC's guidelines on religious discrimination recognize, "[t]he fact that no religious group espouses such beliefs or the fact that the religious group to which the individual professes to belong may not accept such belief will not determine whether the belief is a religious belief of the employee." 29 C.F.R. § 1605.1.

Moreover, the Supreme Court has recognized that Title VII's protections are not limited to beliefs and practices that courts perceive as "acceptable, logical, consistent, or comprehensible to others." *Thomas v. Review Bd. of Ind. Employment Sec. Div.,*

450 U.S. 707, 714, 101 S.Ct. 1425, 67 L.Ed.2d 624 (1981). Indeed, it is well recognized that courts are poor arbiters of questions regarding what is religious and what is not. *Daniels v. City of Arlington, Tex.,* 246 F.3d 500, 505 (5th Cir.2001) (stating that "it is improper for a court to assess what activities are mandated by religious belief").

Within this broad framework, courts have grappled somewhat awkwardly with the question of what makes a particular belief "religious." One district court has taken the approach that while "the court may not look to whether the [employee's] religion mandates or requires the practice in question, the court may nonetheless note whether there is any connection between the [employee's] religion and the asserted belief or practice." *Vetter v. Farmland Indus., Inc.,* 884 F.Supp. 1287, 1307 (N.D.Iowa 1995).

Other courts have seemed to suggest that the existence of this "connection" is for the individual, and not the judge, to determine. Where some defendants have been unsuccessful in challenging an employee's belief on the ground that it is not part of a bona fide religion, other defendants have been successful in proving, even at the summary judgment stage, that the belief or practice as asserted by the plaintiff is not mandated by the religion to which the employee supposedly adheres. *Hussein v. The Waldorf–Astoria,* 134 F.Supp.2d 591, 597 (S.D.N.Y.2001) (granting employer's summary judgment claim after finding that evidence did not support employee's claim of a bona fide religious belief). *Contra Vetter,* 884 F.Supp. at 1307, 1313 (concluding that there was a sufficient "connection" between the plaintiff's asserted belief and his religion and denying defendant's motion for summary judgment); *Lambert v. Condor Mfg., Inc.,* 768 F.Supp. 600, 602 (E.D.Mich.1991) (de-

nying defendant's motion for summary judgment because there existed a question of fact regarding whether plaintiff's opposition to nude pictures of women was "religious").

Courts have noted the obvious fact that Title VII does not afford protection for "what amounts to a 'purely personal preference.'" *Union Independiente,* 279 F.3d at 56 (citation omitted); *see Tiano v. Dillard Dep't Stores, Inc.,* 139 F.3d 679, 683 (9th Cir.1998) (finding that the plaintiff failed to prove that her religious belief mandated that she embark on a pilgrimage during the precise time frame demanded). Again, however, in any close case a court is bound to confront the near impossibility (at least at the summary judgment stage) of distinguishing between a plaintiff's strongly felt personal preference and that same plaintiff's self-styled "religious" belief.

No one would disagree that aspects of dress or appearance are often strongly felt. Despite this, Title VII surely cannot be invoked to permit an employee to apotheosize a dress or grooming preference, merely upon his or her own say-so. It would seem equally clear that the submission of an affidavit describing a custom of dress or grooming as "religious" should not automatically inoculate a complaint from summary judgment and entitle an employee to an inevitable jury trial. Yet the difficulty in making this analysis appears to have convinced some courts simply to withhold scrutiny where a plaintiff asserts that a belief or practice is "religious." *Heller v. EBB Auto Co.,* 8 F.3d 1433, 1438 (9th Cir.1993) (stating that Title VII protects more than the "practices specifically mandated by an employee's religion" and that courts are not to determine what is or is not a religious activity).

While the "religious" basis of a challenged belief or practice is tricky to challenge as a matter of law, the *sincerity* of a practitioner's purported belief (once the belief is accepted as "religious") is virtually unassailable in the Rule 56 context. The First Circuit has stated explicitly that the sincerity of an employee's religious belief "ordinarily should be reserved 'for the factfinder at trial, not for the court at summary judgment.'" *Union Independiente,* 279 F.3d at 56; *Vetter v. Farmland Indus., Inc.,* 120 F.3d 749, 751 (8th Cir. 1997) (stating that "a finding on the [element of sincerity] generally will depend on the factfinder's assessment of the employee's credibility"). *But see, Bushouse v. Local Union 2209, United Auto., Aerospace & Agric. Implement Workers of Am.,* 164 F.Supp.2d 1066, 1075 (N.D.Ind.2001)(holding that a court may consider whether a particular belief is in fact "religious" and sincerely held at the summary judgment stage).

Assuming a plaintiff satisfies the first criterion, the second element of a *prima facie* case requires that employees notify their employers of their religious beliefs or practices. *Union Independiente,* 279 F.3d at 55; *See Chalmers v. Tulon Co. of Richmond,* 101 F.3d 1012, 1019 (4th Cir.1996). The parties here do not dispute that Cloutier provided adequate notice.

The final element of a *prima facie* case requires the plaintiff to show that her religious practice was the basis for the adverse employment decision. The defendant here has not proffered a reason for discharging Cloutier other than her absences from work resulting from her refusal to remove her facial piercing. Though the defendant vigorously disputes the characterization of Cloutier's facial piercing as a "religious" practice, it does not dispute that the facial piercing was the reason for the adverse employment decision.

Once a plaintiff establishes a *prima facie* case of religious discrimination based

on a failure to accommodate, the burden shifts to the employer to show that it offered the employee a reasonable accommodation of her religious practice or that any accommodation would result in undue hardship for the employer. *See Union Independiente*, 279 F.3d at 55; 42 U.S.C. § 2000e(j). The statute does not define the term "reasonable accommodation." Likewise, the statute's legislative history and EEOC guidelines provide no guidance in determining the extent of an employer's accommodation obligation. *Ansonia Bd. of Educ. v. Philbrook*, 479 U.S. 60, 69, 107 S.Ct. 367, 93 L.Ed.2d 305 (1986); *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 75, 97 S.Ct. 2264, 53 L.Ed.2d 113 (1977) ("[T]he employer's statutory obligation to make reasonable accommodation for the religious observances of its employees, short of incurring an undue hardship, is clear, but the reach of that obligation has never been spelled out by Congress or by EEOC guidelines.").

Courts facing the issue of whether an accommodation is "reasonable" have fashioned some rules or guidelines for the inquiry. The Seventh Circuit has held that an employer's accommodation is not reasonable if the accommodation "does not eliminate the conflict between the employment requirement and the religious practice." *E.E.O.C. v. Ilona of Hungary, Inc.*, 97 F.3d 204, 211 (7th Cir.1996). The Fifth Circuit has suggested that a determination of reasonableness should focus on the cost to the employer, while also trying to balance the needs of the employer with the needs of the employee. *E.E.O.C. v. Universal Mfg. Corp.*, 914 F.2d 71, 72–73 & n. 3 (5th Cir.1990) ("The range of acceptable accommodation under Title VII moderates the conflicting interests of both the employee and the employer: (1) it protects the employee by requiring that the accommodation offered be 'reasonable;' and (2) it protects the employer by not requiring any accommodation which would impose an

'undue hardship.' "). Not surprisingly, the courts of appeals have observed that the question of the reasonableness of an accommodation is to be determined on a case by case basis. *Beadle v. Hillsborough County Sheriff's Dep't*, 29 F.3d 589, 592 (11th Cir.1994); *U.S. v. City of Albuquerque*, 545 F.2d 110, 114 (10th Cir.1976). In a typical case, the issue of "reasonableness" may be left to the fact finder. *Universal Mfg.*, 914 F.2d at 73.

■ Once an employer offers a reasonable accommodation, its obligations under Title VII are satisfied. *Philbrook*, 479 U.S. at 68, 107 S.Ct. 367. Title VII does not require that an accommodation be absolute. *Universal Mfg.*, 914 F.2d at 73. In other words, the accommodation offered by the employer does not have to be the best accommodation possible, and the employer does not have to demonstrate that alternative accommodations would be worse or impose an undue hardship. *Wright v. Runyon*, 2 F.3d 214, 217 (7th Cir.1993) (citing *Philbrook*, 479 U.S. at 68, 107 S.Ct. 367).

■ It is important to underline that the search for a reasonable accommodation goes both ways. Although the employer is required under Title VII to accommodate an employee's religious beliefs, the employee has a duty to cooperate with the employer's good faith efforts to accommodate. *Daniels v. City of Arlington, Tex.*, 246 F.3d 500, 506 & n. 30 (5th Cir.2001); *see Philbrook*, 479 U.S. at 69, 107 S.Ct. 367 (recognizing that the search for a reasonable accommodation requires "bilateral cooperation" between the employer and the employee); *Beadle*, 29 F.3d at 593 (stating that an employee has a "duty to make a good faith attempt to accommodate his religious needs through means offered by the employer"); *Brener v. Diagnostic Ctr. Hosp.*, 671 F.2d 141, 145–46 (5th Cir.1982) (upholding judgment for employer where

the employee failed to cooperate with the measures suggested by his employer to accommodate his religious practice); *Chrysler Corp. v. Mann,* 561 F.2d 1282, 1286 (8th Cir.1977) (stating that where an employee does not "cooperate with his employer in its conciliatory efforts, he may forgo the right to have his beliefs accommodated").

■ Finally, if the employer declines to offer an accommodation, the employer then must "demonstrate that any accommodation would have caused it undue hardship." *Ilona of Hungary,* 97 F.3d at 211; *Draper v. U.S. Pipe & Foundry Co.,* 527 F.2d 515, 520 (6th Cir.1975) (stating that employers must demonstrate actual undue hardship because courts are "somewhat skeptical of hypothetical hardships"). "Undue hardship" has been defined by the Supreme Court as anything greater than a *de minimis* cost to the employer in accommodating the religious beliefs of an employee. *Hardison,* 432 U.S. at 84, 97 S.Ct. 2264. Again, in a typical case, the question of what constitutes undue hardship will usually be left to the finder of fact. *Universal Mfg.,* 914 F.2d at 74.

■ Applying these principles to the pending motion, the weakness of the evidence supporting a *prima facie* case is fairly striking. Accepting the CBM as a bona fide religion—a point that defendant hotly disputes—the plaintiff appears to agree, and the court's own examination of the materials available seems to confirm, that the CBM in no way requires a *display* of facial piercings *at all times.* The requirement that she display her piercings, openly and always, represents the plaintiff's personal interpretation of the stringency of her beliefs.

Of course, the fact that the CBM does not mandate the practice that the plaintiff insists on is not, by itself, fatal to Cloutier's claim. *See Union Independiente,* 279 F.3d at 56; *Seshadri v. Kasraian,* 130 F.3d 798, 800 (7th Cir.1997). If Cloutier's belief that she must constantly display her body modifications is her *religious* belief, then it would appear she is entitled to accommodation pursuant to Title VII. Here again, however, the evidence of record fails to support Cloutier's position. As noted above, when she first brought her religious practice to the attention of Costco, she herself offered the accommodation of her wearing a band-aid over her facial piercing. The outset of this lawsuit witnessed the first occasion when Cloutier took the position that any concealment of her piercings would violate her religious scruples.[10]

All these facts suggest strongly that, while Cloutier may have a strong *personal* preference to display her facial piercings at all times—her preference does not constitute a sincerely held *religious* belief.

It is not necessary for the court to wrestle with this troubling question, however, since Costco's offer of accommodation was manifestly reasonable as a matter of law. The temporary covering of plaintiff's facial piercings during working hours impinges on plaintiff's religious scruples no more than the wearing of a blouse, which covers plaintiff's tattoos. The alternative of a clear plastic retainer does not even require plaintiff to cover her piercings. Neither of these alternative accommodations will compel plaintiff to violate any of the established tenets of the CBM. Significantly, Cloutier herself suggested an accommodation along these lines in June of 2001.

**10.** It is perhaps significant that plaintiff does not insist that *all* her body modifications, for example her tattoos, be visible at all times.

Costco has a legitimate interest in presenting a workforce to its customers that is, at least in Costco's eyes, reasonably professional in appearance. The defendant's proffered accommodation reasonably respected the plaintiff's expressed religious beliefs while protecting this interest. In contrast, the plaintiff, after backing off from her original proposal, has offered no accommodation whatsoever, insisting instead that the defendant may not limit her piercings in any way, either in nature or number, without compelling her to disregard her religious scruples and thereby violating Title VII.

Title VII does not demand that this reasonable accommodation be favored, or even accepted, by plaintiff. So long as the accommodation reasonably balances the employee's observance of her religion with the employer's legitimate interest, it must be deemed acceptable. *See Philbrook,* 479 U.S. at 70, 107 S.Ct. 367.

Courts have repeatedly recognized dress and grooming requirements as bona fide occupational qualifications. *Daniels,* 246 F.3d at 506 (finding that an evangelical Christian police officer suffered no violation of Title VII when the police chief declined to allow him to wear a cross on his uniform and where the officer failed to fulfill his duty to cooperate in working out a reasonable accommodation); *Hussein,* 134 F.Supp.2d at 598 (involving a no-beard policy in catering); *E.E.O.C. v. Sambo's of Ga., Inc.,* 530 F.Supp. 86, 91 (N.D.Ga.1981) (involving a clean-shaven policy in restaurant).[11] Enforcing these kinds of dress

restrictions is not discriminatory "as long as the employer's grooming requirement is not directed at a religion." *Hussein,* 134 F.Supp.2d at 599. There is no evidence here that Costco's dress policy was directed at any religion.

In sum, accepting the doubtful proposition that the record would support a *prima facie* case here, no reasonable jury could conclude that Costco's proposal to Cloutier was anything other than a reasonable accommodation.[12] Hence, the court will allow the defendant's summary judgment motion as to this count.

### B.  *Chapter 151B*

Chapter 151B, § 4(1A) forbids an employer from imposing on an individual as a condition of employment any terms or conditions, "compliance with which would require such individual to violate, or forego the practice of, his creed or religion as required by that creed or religion." Where there is a conflict between an employee's creed or religion and an employment requirement, the statute directs that the employer "make reasonable accommodation to the religious needs" of the employee. *Id.* Reasonable accommodation is defined as "such accommodation to an employee's ... religious observance or practice as shall not cause undue hardship in the conduct of the employer's business." *Id.* The statute assigns to the employee the burden of proof as to the required practice of his creed or religion and to the

---

11. In other contexts, courts have not hesitated to uphold an employer's right to promote an appearance standard among its employees. *Cf. Woods v. Safeway Stores, Inc.,* 420 F.Supp. 35, 42 (E.D.Va.1976) (holding that employer's no-beard policy served a legitimate business purpose and did not discriminate against a black employee who suffered from a skin condition that was severely aggravated by shaving); *Willingham v. Macon Tel. Publ'g Co.,*

507 F.2d 1084, 1088 (5th Cir.1975) (holding that employer's no long hair on males policy did not discriminate on the basis of gender).

12. Because the court's decision is based on the existence of a reasonable accommodation, it is unnecessary to address the defendant's assertion that undue hardship would result from exempting the plaintiff from Costco's dress code.

employer the burden of proof to show undue hardship.

■ As originally construed, the language of the statute "limit[ed] the application of the statute to persons whose practices and beliefs mirror those required by the dogma of established religions." *Pielech v. Massasoit Greyhound, Inc.*, 423 Mass. 534, 539–40, 668 N.E.2d 1298 (1996). Consequently, the Supreme Judicial Court of Massachusetts ("SJC") held that chapter 151B, § 4(1A) violated the establishment clause of the First Amendment because the protections of the statute preferred some religions over others and promoted excessive governmental entanglement with religion. *Id.* at 540, 668 N.E.2d 1298. Specifically, the SJC held that statute in its earlier form "effectively compell[ed] courts, in cases where the dogma of an established church or religion is disputed, to ascertain the requirements of the religion at issue.... These are not proper matters for the courts to decide." *Id.* at 542, 668 N.E.2d 1298.

In response to *Pielech*, the Massachusetts Legislature amended ch. 151B, § 4(1A).[13] St.1997, c. 2, § 2 (effective February 27, 1997). The amendment added language to define "creed or religion" as "any sincerely held religious beliefs, without regard to whether such beliefs are approved, espoused, prescribed or required by an established church or other religious institution or organization." *Id.* Thus, the protected religious practice need not be one endorsed by any organized church or sect; it need only be a *sincerely held* religious belief. *Opinion of the Justices*, 423 Mass. 1244, 1246, 673 N.E.2d 36 (1996) ("A sincerely held religious belief would be protected by § 4(1A) without

regard to whether that belief was one approved or required by any established church or other religious institution or organization."). The amended statute, nonetheless, still places on the employee the burden of proof as to the required practice of the religion.

Even before the amendment, the language of the statute itself "essentially outlines a three-part inquiry in any case involving allegations of religion-based discrimination." *N.Y. & Mass. Motor Serv., Inc. v. Mass. Comm'n Against Discrimination*, 401 Mass. 566, 575–76, 517 N.E.2d 1270 (1988). First, the employee must prove that "the employer required the [employee] to violate a religious practice which is required by the [employee's sincerely held religious belief]." *See id.*; chapter 151B, § 4(1A). As the language of chapter 151B, § 4(1A) states, it is of no consequence whether the employee's belief is "approved, espoused, prescribed or required by an established church or other religious institution or organization." There is little room for an employer to challenge the religious basis or mandate of an employee's belief. *Sagar v. Sagar*, 57 Mass.App.Ct. 71, 74, 781 N.E.2d 54 (2003) (stating that a court "may not examine the truth behind a person's religious beliefs"). On the other hand, "[i]nquiry as to whether an employee's belief is sincere is constitutionally appropriate." *Opinion of the Justices*, 423 Mass. at 1246, 673 N.E.2d 36; *Sagar*, 57 Mass. App.Ct. at 74, 781 N.E.2d 54.

The second stage of the inquiry requires that an employee who needs time off to observe her Sabbath or other holy day must give at least ten days notice to her

---

13. Before passing the bill, the legislature submitted questions to the SJC regarding the constitutionality of the proposed amendment. One of the questions asked if the law as amended would violate the establishment clause of the First Amendment, to which the SJC responded in the negative. *Opinion of the Justices*, 423 Mass. 1244, 1246, 673 N.E.2d 36 (1996).

employer. *N.Y. & Mass. Motor Serv.*, 401 Mass. at 576, 517 N.E.2d 1270; Ch. 151B, § 4(1A). This stage is clearly inapplicable to this case.

The final stage of the three-part inquiry involves the employer's obligation to accommodate the employee's religious needs. *N.Y. & Mass. Motor Serv.*, 401 Mass. at 576, 517 N.E.2d 1270; Ch. 151B, § 4(1A). Reasonable accommodation is defined as such an accommodation to the employee's practice "as shall not cause undue hardship in the conduct of the employer's business." Ch. 151B, § 4(1A). The employer bears the burden of proof to show undue hardship, which is defined in the statute as including circumstances where accommodation would result in the employer's inability "to provide services which are required by and in compliance with all federal and state laws" or "where the health and safety of the public would be unduly compromised by the absence of [the] employee." Ch. 151B, § 4(1A). Upon a showing of undue hardship, "the employer is not obliged to accommodate the employee's religious observance or practice." *Opinion of the Justices*, 428 Mass. at 1247, 702 N.E.2d 8.

Regrettably, there is little case law addressing chapter 151B, § 4(1A). Thus, where there are gaps in the interpretation or application of the statute, this court will turn to case law interpreting Title VII, whose protections mirror those of chapter 151B, § 4(1A). *Wheatley v. Am. Tel. & Tel. Co.*, 418 Mass. 394, 397, 636 N.E.2d 265 (1994) (stating that it is the practice of the Massachusetts courts "to apply Federal case law construing the Federal anti-discrimination statutes in interpreting G.L. c. 151B").

As with plaintiff's Title VII claim, her chapter 151B claim must fail. Arguably, the language of chapter 151B casts a broader net than Title VII in covering purely personal beliefs that may be entitled to protection from discrimination. Chapter 151B specifically states that whether a formal religious organization espouses or requires such belief is irrelevant.

Whatever minor differences may exist between the federal and state laws on the issue of belief, however, the two statutes appear to treat the question of reasonable accommodation identically. For purposes of 151B, the court must therefore conclude that Costco's offer of accommodation was reasonable as a matter of law. Cloutier's preferred arrangement, unlimited permission to wear her piercings at any time and in any manner, was obviously no accommodation at all. Accordingly, the court will allow the defendant's motion for summary judgment as to this count.[14]

## V. CONCLUSION

Because the law supporting summary judgment in favor of defendant is reasonably clear, no need exists to certify a question to the SJC. For the reasons set forth above, defendant's Motion for Summary Judgment is hereby ALLOWED, and the plaintiff's Motion to Certify a Question of Law is hereby DENIED. The clerk will

---

14. In rendering this decision the court is aware that the record would support the conclusion that plaintiff was terminated on July 14, 2001, whereas Costco's offer of reasonable accommodation was not made until approximately four weeks later, on August 10, 2001. This delay does not justify denial of the motion for summary judgment. First, the record is unclear whether Costco's offer included the possibility of pay for some or all of the four weeks. Second, the delay in transmitting the offer emerged as much from a failure of cooperation by plaintiff as from any intransigence on the part of the defendant. Finally, the court assumes that plaintiff would not be trying this case with damages limited to four weeks' pay.

enter judgment for the defendant; the case may now be closed.